Kevin W. PEASE, Appellant,

v.

STATE of Alaska, Appellee.

Marvin L. Roberts, Appellant,

v.

State of Alaska, Appellee.

Nos. A–7635, A–7638.

Court of Appeals of Alaska.

Sept. 27, 2002.

Lori M. Bodwell, Law Office of Lori M. Bodwell, and Dick L. Madson, Law Office of Dick L. Madson, Fairbanks, for Appellant.

W.H. Hawley, Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

### OPINION

COATS, Chief Judge.

The state charged Marvin L. Roberts, Kevin W. Pease, Eugene G. Vent, and George C. Frese with the assault and robbery of Franklin Dayton and the robbery, sexual assault, and murder of a fifteen-year-old juvenile, J.H. These crimes occurred during the early morning hours of October 11, 1997. Pease and Roberts were tried together. A jury convicted both defendants of second-degree assault of Dayton and of first-degree robbery and second-degree murder of J.H. Frese and Vent were convicted in separate trials and their appeals are pending before this court.[1]

Superior Court Judge Ben J. Esch sentenced Pease to a total term of seventy-five years with fifteen years suspended. He sentenced Roberts to a total term of forty-two years with ten years suspended. Pease and Roberts raise several issues in their appeal to this court. We affirm their convictions but remand a portion of their sentences for reconsideration.

*Factual Background*

*a. The assault and robbery of Franklin Dayton*

Arlo Olson testified that he witnessed the assault of Franklin Dayton. Olson attended a wedding reception, which began on the night of October 10, 1997, at the Eagles Hall in Fairbanks. According to Olson's testimony, he was standing on the front steps of the Eagles Hall between 12:30 and 1:00 a.m. on October 11, 1997, when Roberts, Pease, Vent, and Frese drove up in Roberts's blue, two-door car. Frese asked Olson if he wanted to get high. Olson declined, and the four drove away.

Dayton also attended the wedding celebration. According to Dayton's testimony, at about 1 a.m. on October 11, after having several drinks, he left the reception and walked toward Tommy's Elbow Room. As Dayton was walking, a car stopped behind him. Someone from the car tripped Dayton, pushed him down, stepped on his hand, kicked him in the ribs, and took his money. Someone told Dayton not to "look back"; Dayton did not recognize the voice. Dayton thought the robbers said something about having a gun but was not sure. He heard two doors slam after the attackers took his money and left. He thought about four people robbed him and they drove a tan car. He did not recognize any of them.

Dayton returned to the Eagles Hall. He told his sisters, Katherine Quirk and Vaughn Reitan, that the four robbers had put a gun to his head and "threatened that he wasn't going to be the only one." He told them he was thrown face-down and could not identify any of the four assailants. Dayton's sister-in-law, Susan Paskvan, called 911 at 1:35 a.m., and his two sisters took him to the hospital.

Olson testified that about half an hour after he talked with Vent, Frese, Roberts, and Pease, he watched the four assault Dayton down the street from the front steps of the Eagles Hall. He saw Pease push Dayton to the ground. Frese, Pease, Vent, and Roberts then all kicked Dayton. One of the four men yelled, "Give me your fucking money, bitch," and Dayton handed something to one of the four. Olson watched the four men run to and enter Roberts's car.

---

1. *See Frese v. State,* Court of Appeals File No. A–7640; *Vent v. State,* Court of Appeals File No. A–7647.

The accuracy of Olson's testimony was seriously disputed at trial. Olson admitted that he had drunk a considerable amount on the evening in question and had smoked marijuana earlier in the day. He testified that the fight only lasted about thirty seconds, that the assailants had their backs to him half the time, and that he really only got a look at them while they were running back to their car. He estimated that the assault occurred about 400 feet away from him. The defense presented evidence that the distance was greater than that.

But the state presented evidence that Olson was able to identify the defendants. Not only had he seen them earlier in the evening, but Olson and Vent had been friends since Olson's junior year in high school. Olson met Frese in the summer of 1997, had been to his house, had talked to him frequently, and considered him a friend. Olson also identified Roberts, Pease, and Roberts's car at trial.

### b. The murder and robbery of J.H.

J.H., age fifteen, met his mother at her job during the afternoon of October 10, borrowed some money, and put it in his wallet. He spent the evening of October 10 with Chris Stone at a Fairbanks residence where a third friend was babysitting. The boys took some prescription drugs during the evening to get high. After consuming some of the pills, J.H. fell out of a chair and had a seizure. J.H. and Stone left the babysitting residence after midnight. At about 1:15 a.m., J.H. and Stone parted company near downtown Fairbanks, and J.H. started walking home alone.

At 1:28 a.m. on October 11, Melanie Durham, a resident of the Fairbanks WICCA shelter, who had been watching TV, stepped outside to have a cigarette. Minutes later, Durham heard a "really horrendous [loud] smack, smack." The "smacks" were followed by someone calling, "Help me, help me," who then was quieted by more "smacks." She heard a highly intoxicated, slurred, deep voice with a Native accent growl something indistinguishable. Durham then heard more

> smacks, really just it was horrendous....
> [T]he way it sounded was like whatever was hitting this kid, ... it was wrapping

around, that's how bad it sounded. And then, I heard some more, then a[n] angry voice, and I realized it was really bad, and that whoever was getting hit wasn't saying anything.

The sounds were coming from the intersection of Ninth and Barnett, half a block from the shelter, but Durham's view of the intersection was obstructed.

Sometime before 2:00 a.m., Stone used a phone at Carrs Foodland. While Stone was using the phone, Pease, standing nearby, stared at him to the point that Stone felt uncomfortable. Stone saw a car parked nearby that looked like Roberts's car. No one was sitting in the driver's seat, but the car was otherwise full.

At about 2:45 a.m., citizens driving on Barnette Street spotted J.H. lying partly on the street and partly on the sidewalk at Ninth and Barnette. J.H. was badly beaten, his pants were down around his knees, and his personal effects were scattered in the street. One of the citizens called 911, and paramedics responded and took J.H. to the hospital.

The width and distance between tire marks observed at the scene were similar to the width and distance between the tires on Roberts's car.

A sexual-assault nurse-examiner, Diane Hill, examined J.H. at the hospital. Hill observed that J.H.'s anal verge was swollen and red, and she saw minute tears all around his anal verge. Hill also observed a large, deep, long tear on J.H.'s anus. Using an anoscope, she found two abrasions on the wall of the rectum three or four inches inside the anal verge.

About noon, that day, October 11, Frese sought treatment for an injured foot at the Fairbanks Memorial Hospital emergency room. Frese said that he had injured his foot by kicking someone during a fight downtown the night before. The police obtained the hiking boots Frese was wearing during the fight. Fairbanks Police Lieutenant David Kendrick and Julie Klaker, a nurse, compared the tread of Frese's shoe with the injury on the left side of J.H.'s head. Kendrick found the similarity between the lug pattern on the shoe and the lug imprints on

J.H.'s face striking. Klaker said the print on the bottom of the shoe "matched up" to the print on J.H.'s face.

J.H. died on October 12. Dr. Franc Fallico performed the autopsy. During the external examination, Dr. Fallico observed multiple separate injuries on J.H.'s head and body. During the internal examination, Dr. Fallico found blood and blood clots on the surface of the brain and hemorrhages in the mid-brain; he attributed J.H.'s death to blunt-force trauma to his head. He found two scratches inside J.H.'s colon about four inches from his anus. Dr. Fallico found similarities between the tread pattern on Frese's shoes and the pattern on J.H.'s head. At trial, however, the defense presented an expert, Dr. John Thornton, who concluded that the shoes the police seized from Frese did not make the prints on J.H.'s face.

Pease told the police that he had not seen Roberts, Frese, or Vent on the night of October 10–11, claiming he had been with his girlfriend, Jessica Lundeen. But Lundeen denied having seen Pease at any time during the evening and night of October 10–11. Pease presented an alibi defense based on several witnesses who testified he had been at two parties on the evening in question.

The state also presented evidence from two people who were in jail with Pease prior to trial. According to Angela Harman, she asked Pease why he had murdered J.H. In response, Pease stated that, "[I] did it for the punk's money." A second inmate, John Heffle, asked Pease if he had committed the murder. Pease responded, "I was fucked up, and it was bad."

Roberts also presented an alibi defense at trial. Several witnesses testified that he was at the Eagles Hall at the time the assaults occurred.

The jury convicted Pease and Roberts of second-degree assault of Dayton and first-degree robbery and second-degree murder of J.H. This appeal followed.

*Whether Judge Steinkruger erred in failing to sever for trial the charges relating to the assault of Dayton from the charges relating to the robbery and murder of J.H.*

Frese filed a motion to sever the charges relating to the assault on Dayton from the charges relating to the robbery and murder of J.H. He argued that the jury might improperly use the evidence of the Dayton assault to convict him of the robbery and murder of J.H. The state opposed the motion, and Superior Court Judge Niesje J. Steinkruger denied the motion to sever without discussion. After Judge Steinkruger denied the motion, Pease moved without opposition to join Frese's motion. The record does not reflect that Judge Steinkruger took any action on Pease's application to join the severance motion.

Pease and Roberts concede that it was permissible under the Alaska Criminal Rules to join the Dayton and J.H. charges, but they argue that the evidence against them in the Dayton case was much stronger than in the J.H. case. They claim that the evidence in the Dayton case improperly bolstered the J.H. case.

The state argues that Roberts waived the severance issue by not moving to sever before trial. Roberts contends that an objection made by one codefendant is deemed to have been made by all codefendants absent an objection. But generally, a defendant may not rely on a codefendant's motion or objection absent a special agreement with the trial court.[2] And we have not found an agreement on the record that would allow Roberts to rely on Pease's motion. But we

---

2. *See, e.g., State v. Carriker*, 269 S.C. 553, 238 S.E.2d 678 (1977); *People v. Lopez*, 158 A.D.2d 623, 623, 551 N.Y.S.2d 606 (N.Y.App.Div.1990) ("The objections made by the codefendants did not preserve the allegations of error for this defendant."); *Martinez v. State*, 833 S.W.2d 188, 191 (Tex.App.1992) (defendant may not rely on the objection of his codefendant to preserve error unless defendant has adopted the objection on the record); *see also Owens–Corning Fiberglas*

*Corp. v. Malone*, 916 S.W.2d 551, 556 (Tex.App. 1996) (defendant in multi-defendant products liability action could rely on evidentiary objections made by codefendants' counsel where trial court apparently required and defendants agreed that objection made by one defendant would be considered as having been made on behalf of all defendants and plaintiffs did not object to such arrangement).

need not resolve this issue because, as we explain below, we conclude that Judge Steinkruger did not err in denying the motion for severance.

■ The state argues that Pease waived his severance claim because he did not renew it at trial. But we stated in *Mathis v. State*[3] that a defendant does not need to renew a motion for severance at trial if the trial court clearly and unequivocally rules on the claim before trial.[4] Of course, if circumstances arise during trial that undermine the judge's earlier decision denying severance, the defendant has a duty to renew the motion for severance during trial to allow the trial judge to consider the actual circumstances as they arise at trial.[5] Because Judge Steinkruger decided the motion before trial and the motion was not renewed, we conclude that we should review the defendants' claim of prejudice based on the information presented to Judge Steinkruger before trial.

■ Once joined, a motion to sever offenses encompasses two separate inquiries.[6] First, the trial court must determine whether the charged offenses are so related as to make joinder proper.[7] Second, the court must determine whether joinder of the offenses for trial would unduly prejudice the defendant.[8] Because the defendants have conceded proper joinder, the only issue before us is whether Judge Steinkruger's decision unduly prejudiced the defendants.

■ This court will only overturn a trial court's denial of a motion to sever if the defendant can show both an abuse of discretion and actual prejudice.[9] The first step in deciding whether Judge Steinkruger erred in denying the motion to sever is to determine whether Judge Steinkruger could conclude that the evidence of the crimes would be cross-admissible if tried separately.[10] If the

evidence would be cross-admissible if tried separately, the defendant is hard-pressed to show actual prejudice from the failure to sever, since the evidence would have been admitted even if the judge had granted separate trials. If the trial court determines the evidence is not cross-admissible, the second step is to decide whether Judge Steinkruger abused her discretion when she found the defendants would not suffer actual prejudice from having this otherwise inadmissible evidence admitted at the joint trial.

■ In the present case, the pretrial motion claimed that the evidence of the assault on Dayton would prejudice the defendants by influencing the jury in deciding whether the defendants robbed and murdered J.H. But if evidence of the assault on Dayton would have been admitted in a separate trial involving whether the defendants robbed and murdered J.H., then the defendants did not suffer any prejudice by its admission at the joint trial. As we explain below, we conclude that Judge Steinkruger did not err in determining that the evidence of the earlier assault on Dayton would have been admissible in a separate trial on the charges that the defendants robbed and murdered J.H.

The facts alleged in the severance pleadings established that the assault on Dayton and the robbery and murder of J.H. occurred within forty-five minutes of each other. Olson saw Roberts, Pease, Vent, and Frese assault Dayton. Dayton was attacked by several people who beat and robbed him while he was walking alone in downtown Fairbanks. The evidence suggested that J.H. had undergone a similar, but more vicious, attack.

We have previously approved the admission of evidence that a defendant committed

---

3. 778 P.2d 1161 (Alaska App.1989).

4. *Id.* at 1167 n. 2.

5. *See Petersen v. State*, 838 P.2d 812, 816 (Alaska App.1992).

6. *See Ashley v. State*, 6 P.3d 738, 741 (Alaska 2000); Alaska R.Crim. P. 8; Alaska R.Crim. P. 14.

7. *See Ashley*, 6 P.3d at 741; Alaska R.Crim. P. 8.

8. *See Ashley*, 6 P.3d at 741; Alaska R.Crim. P. 14.

9. *See Catlett v. State*, 585 P.2d 553, 556 (Alaska 1978); *Cleveland v. State*, 538 P.2d 1006, 1008–09 (Alaska 1975).

10. *See Mathis v. State*, 778 P.2d 1161, 1167 (Alaska App.1989).

a related offense within a short period of time of another offense. In *Hoffman v. State,*[11] in defense of a sexual assault charge, Hoffman argued consent.[12] This court approved admission of evidence that Hoffman had violently sexually assaulted a different woman just prior to his charged assault. We reasoned that the prior assault was relevant to the charged offense because it could be "inferred that Hoffman was in the same emotional state during both encounters."[13] In *Hoffman,* we relied on *Lerchenstein v. State,*[14] where we held "that Evidence Rule 404(b) allowed the introduction of evidence that a murder defendant had been 'angry and combative . . . immediately prior to the [homicide].' "[15]

In *Miller v. State,*[16] we held that Miller's robbery and burglary at a near-by trailer less than an hour before the charged murder were "directly relevant to establish Miller's state of mind at the time of the murder, to show that he was acting in concert with [his codefendant], and to prove his capacity to form the specific intent required for murder."[17] Likewise, in *Ciervo v. State,*[18] we approved the state's evidence of a confrontation between Ciervo and another individual five hours prior to the charged shooting.[19]

*Hoffman, Ciervo,* and *Miller* support the admissibility of the evidence of the Dayton incident at a separate trial on the J.H. charges.[20] Because the crimes were committed within a close temporal and physical proximity to each other, apparently involved the same perpetrators, and consisted of similar attacks on the victims, the evidence of each crime would have been cross-admissible under Rule 404(b)(1) to prove state of mind and sequence of events.

The defendants argue that even though the evidence of the Dayton offense would have been admissible under Evidence Rule 404(b), Rule 403 would have prevented it from being introduced at a separate trial because the case against the defendants on the robbery and murder of J.H. was weak. They argue that they were prejudiced by admission of the stronger Dayton assault evidence, and the jury might have improperly used that evidence to convict them of the robbery and murder of J.H. In our view, Judge Steinkruger properly could determine that the evidence that the defendants were together during the assault and robbery of Dayton was substantial evidence that the defendants had, only a short time later, committed a similar assault on J.H. that ultimately led to his death. The superior court properly could determine that admission of this evidence was not unduly prejudicial.[21]

Because the evidence of the Dayton incident would have been admissible at a separate trial on the J.H. incident, Judge Steinkruger did not err under Criminal Rule 14 in denying the motion to sever the charges.

**11.** 950 P.2d 141 (Alaska App.1997).

**12.** *Id.* at 147.

**13.** *Id.*

**14.** 697 P.2d 312 (Alaska App.1985), *affirmed on appeal,* 726 P.2d 546 (Alaska 1986).

**15.** *Hoffman,* 950 P.2d at 147 (quoting *Lerchenstein,* 697 P.2d at 319).

**16.** 778 P.2d 593 (Alaska App.1989).

**17.** *Id.* at 596–97.

**18.** 756 P.2d 907 (Alaska App.1988), *overruled on other grounds by Swain v. State,* 817 P.2d 927, 931–34 (Alaska App.1991).

**19.** *Id.* at 911.

**20.** *See also Vessell v. State,* 624 P.2d 275, 278 (Alaska 1981) (defendant's conduct at a store minutes after the armed robbery of another store for which he was accused was admissible to show that he was the same man who robbed the first store); *Kelly v. State,* 663 P.2d 967, 972 (Alaska App.1983) (bad checks written by defendant near time he wrote the bad check for which he was prosecuted were admissible to prove intent and absence of mistake); *Davidson v. State,* 642 P.2d 1383, 1390 n. 8 (Alaska App.1982) (upholding trial court's refusal to sever charge based on an assault occurring six days before other charged murder because defendant's actions could be viewed as a continuing course of conduct and since the assault charge would have been admissible in the murder trial to prove criminal intent or motive or to show a common scheme or plan even if the charges had been severed).

**21.** A.R.E. 403.

*Whether Pease and Roberts should be granted a new trial based upon Judge Esch's ex parte interview of a juror*

During trial, Judge Esch informed the parties that a juror had approached him, wanting to talk privately. He told the parties he would meet with the juror on the record to see what he wanted and then talk to the parties.

He met with the juror, Rhett Buchanan, who said he was concerned about the defense attorneys' conduct. Buchanan mentioned Pease's attorney, Lori Bodwell, but primarily cited two incidents involving Roberts's attorney, Dick Madson, where the juror thought Madson's conduct had been inappropriate. Judge Esch told Buchanan he would talk to the attorneys and ask them to act more professionally. Buchanan said that would be fine, and the conversation ended.

When the court reconvened after the weekend, Judge Esch informed the parties that his conversation with Buchanan had not been picked up by the tape and therefore there was no record of the conversation. He told the attorneys that Buchanan was concerned with Madson's conduct and gave the specific examples. Judge Esch told the parties that Buchanan had indicated he would not hold his concerns against Roberts. The parties did not raise any objections about Judge Esch's meeting with Buchanan or ask Judge Esch to take any additional action. Contrary to Judge Esch's understanding, his conversation with Buchanan was successfully recorded.

Roberts and Pease first contend that Judge Esch violated their right to be present by resolving Buchanan's concerns without consulting them. They also assert that before talking to Buchanan, Judge Esch told them only that he was going to listen to Buchanan's concerns. They argue that they were misled because Judge Esch actually had a conversation with Buchanan. Furthermore, having reviewed the tape recording, they contend that Judge Esch made significant omissions in what Buchanan said. In the first place, Judge Esch never mentioned that Buchanan indicated he had some concerns about Bodwell, Pease's attorney. Second, Buchanan never said that he would not hold Madson's behavior against Roberts. They point out that, because Judge Esch informed them that the conversation with Buchanan had not been recorded successfully, they had no opportunity to review the court's actions or object until after the transcript revealed the full conversation.

■ In general, criminal defendants have the right to be present at every stage of the proceedings following their indictment.[22] The right to be present is rooted in the defendant's constitutional right to confront the witnesses against him.[23] And, it is protected by the guarantee of due process "in some situations where the defendant is not actually confronting witnesses or evidence against him." [24]

The defendant's right to be present extends not only to those proceedings in which the defendant confronts adverse witnesses or evidence but also to "any trial-related proceeding at which defendant's presence has a 'reasonably substantial' relation to defendant's ability to defend against the criminal charge"—that is, to "any stage of the criminal proceeding that is critical to its outcome if [the defendant's] presence would contribute to the fairness of the procedure." [25]

■ If a defendant has a constitutional right to be present at a proceeding, the defendant must personally waive his right to be present or expressly consent to allow the

---

**22.** *See* Alaska R.Crim. P. 38(a); *Faretta v. California,* 422 U.S. 806, 820 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975) (A defendant has a constitutional "right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.").

**23.** *See* U.S. Const. amends. VI, XIV; Alaska Const. art. 1, §§ 1, 7; *Dixon v. State,* 605 P.2d 882, 884 n. 3 (Alaska 1980); *Henry v. State,* 861 P.2d 582, 592 (Alaska App.1993).

**24.** *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985).

**25.** *Malloy v. State,* 1 P.3d 1266, 1271 (Alaska App.2000), *overruled on other grounds,* 46 P.3d 949 (Alaska 2002) (citations omitted).

proceeding to occur outside his presence.[26]

▮▮▮ While a defendant has the right to be present at *every* stage of the trial where his presence could have an impact on the decision process, at least under federal law, he does not have an absolute right to be present at every communication between a judge and juror.[27] "[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right."[28] For instance, in *United States v. Olano*,[29] the Ninth Circuit held the trial court did not violate the United States Constitution by meeting with a juror outside of the presence of the defendants.[30] There, midtrial, a juror informed the trial judge of a possible conflict that might reflect on the juror's ability to be impartial. The judge consulted the parties about whether they wanted her to speak with the juror alone in chambers.[31] Counsel for one codefendant and the prosecutor consented; the other attorneys did not object.[32] The circuit court held the right to be present had been waived.

▮▮▮ Alaska case law prohibits ex parte communication between the judge and jury about evidence once deliberations have begun.[33] Additionally, it is error for a judge to receive the verdict outside the presence of the defendant (even if counsel is present).[34] However, this court has held it was not error for a trial judge who received a note from a juror during trial regarding evidence to inform the parties of its existence and refuse to disclose the contents of the note when he did not respond to the juror's question but generally instructed the jury he would not answer questions.[35]

In *Peckham v. State*,[36] without reaching the issue of waiver, this court held any error the trial judge committed by questioning two jurors outside Peckham's presence regarding possible juror misconduct was harmless beyond a reasonable doubt.[37] A juror brought to the court's attention information regarding the possible inappropriate conduct of another juror.[38] The trial judge informed the parties of the juror's information and gave them the opportunity to voir dire the relevant jurors. Fearing the jurors might feel threatened by the interview and become prejudiced against one side or the other, the parties asked the judge to question the juror in camera.[39] In finding that any error was harmless beyond a reasonable doubt, this court relied on the fact that Peckham did not demonstrate his personal presence would have added anything to the voir dire of the jurors or protected him from any prejudice and that the trial judge was unlikely to have granted a motion for mistrial had the defendant requested it.[40] This court also noted that Peckham's counsel was informed of and approved the court's ex

---

26. *See Dixon*, 605 P.2d at 885 n. 8 ("[T]he constitution[ ] mandate[s] that the right [to be present] be personally exercised by the defendant or with his express consent.").

27. *See Gagnon*, 470 U.S. at 526, 105 S.Ct. at 1484; Alaska R.Crim. P. 38.

28. *Gagnon*, 470 U.S. at 526, 105 S.Ct. at 1484 (quoting *Rushen v. Spain*, 464 U.S. 114, 125–26, 104 S.Ct. 453, 459, 78 L.Ed.2d 267 (1983) (Stevens, J., concurring)).

29. 62 F.3d 1180 (9th Cir.1995).

30. *Id.* at 1190–91.

31. *Id.*

32. *Id.* at 1190.

33. *See Cox v. State*, 575 P.2d 297, 300 (Alaska 1978) (holding judge's ex parte communication through bailiff regarding jury's playback request was constitutional error); *Richardson v. State*, 579 P.2d at 1372, 1374 (Alaska 1978) (playback of testimony without presence of parties or judge and without notifying parties was error); *State v. Hannagan*, 559 P.2d 1059, 1065 (Alaska 1977) (error to permit playback of testimony in defendant's absence without express waiver by defendant).

34. *See Lee v. State*, 509 P.2d 1088, 1090–91 (Alaska 1973) (decided under Alaska R.Crim. P. 38).

35. *See Brodine v. State*, 936 P.2d 545, 552–53 (Alaska App.1997).

36. 723 P.2d 638 (Alaska App.1986).

37. *Id.* at 640.

38. *Id.* at 638.

39. *Id.* at 638–39.

40. *Id.* at 640.

parte voir dire of the jurors and the communication did not involve a deliberating juror (both questioned jurors were excused as alternates).[41]

Frankly, the issue Pease and Roberts raise is a difficult one. The state's argument would be considerably stronger if Judge Esch had addressed the parties and obtained a specific waiver of their right to be present before he questioned the juror. Once Judge Esch informed the parties that the proceedings had not been recorded successfully, it is understandable that the parties would take him at his word and would not attempt to review the record during trial. And, once the record surfaced following the trial, it is perhaps not surprising that Judge Esch's summary of what the juror told him was not entirely accurate. Judge Esch did not relay to counsel that the juror had mentioned Ms. Bodwell's behavior in addition to Mr. Madson's. Moreover, the juror never specifically said that he would not hold Madson's behavior against his client. Instead, this apparently was an impression that Judge Esch received from the juror.

■ After carefully reviewing the record, we conclude that the defendants waived any objection to the procedure Judge Esch followed. The juror indicated that he wanted to talk to Judge Esch in private. It appears that the attorneys, with their clients present, made a tactical decision to allow the juror to have a private meeting with the judge. There was certainly a risk that the juror might feel alienated if he was not allowed to have a private meeting. Also, the juror might be less candid about his concerns in a more formal proceeding rather than in a private meeting with the judge.

After Judge Esch met with the juror, he explained the juror's general concern: that he had been bothered by Madson's behavior. The judge gave two specific examples. He told the attorneys that his attempt to record the proceeding had been unsuccessful. In spite of this information, the attorneys did not ask Judge Esch to take any further action. They had numerous possibilities. They could have asked the judge to conduct a proceeding where they could have been present. Or, the attorneys could have asked Judge Esch to reinterview the juror outside their presence to reconstruct the record for subsequent review. Another possibility was to ask him to either disqualify the juror immediately or wait until the end of the case and, if there were sufficient alternate jurors, excuse the juror at that time. They also could have moved for a mistrial.

But instead of taking these actions, the parties went forward with the trial and obtained a verdict. Having obtained an unfavorable verdict, they now argue that they were prejudiced. The fact remains that it appears the trial court had many options to obviate any prejudice had the parties asked for relief during the trial. Where a defendant chooses not to move to cure possible prejudice when the judge has the opportunity to cure the prejudice, gambling on a favorable verdict, this court and the Alaska Supreme Court have held that the claim is waived.[42] We conclude that Pease and Roberts waived any objection to the procedure Judge Esch followed in questioning the juror.

*Whether Roberts's case should be reversed because Judge Esch permitted John Heffle to testify to an admission made by Pease*

The United States and Alaska Constitutions guarantee defendants the right to confrontation, including the right to cross-examine witnesses against them, in all criminal matters.[43] In *Bruton v. United States*,[44] the Supreme Court held

> that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a

---

41. *Id.* at 641.

42. *See Owens v. State,* 613 P.2d 259, 263 (Alaska 1980); *Davidson v. State,* 642 P.2d 1383, 1386–89 (Alaska App.1982).

43. *See* U.S. Const. amends. VI & XIV; Alaska Const. art. I, § 11; *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 1623, 20 L.Ed.2d 476

(1968); *Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987); *Hawley v. State,* 614 P.2d 1349, 1358 (Alaska 1980).

44. 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant.[45]

In *Richardson v. Marsh*,[46] the Supreme Court limited its *Bruton* holding to situations where the nontestifying codefendant's confession directly implicates the defendant.[47] The Court noted:

> In *Bruton*, the codefendant's confession "expressly implicat[ed]" the defendant as his accomplice. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating." By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony).
>
> Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence.[48]

The *Marsh* dissent disagreed with the majority's assertion that the jury's ability to abide by an instruction depends on whether the defendant is named in the confession. The dissent relied on the premise that "certain kinds of hearsay 'are at once so damaging, so suspect, and yet so difficult to discount, that jurors cannot be trusted to give such evidence the minimal weight it logically deserves, *whatever* instructions the trial judge might give.'"[49] The dissent urged continued application of *Bruton's* "powerfully incriminating" analysis whenever the state presents codefendant hearsay confessions in a joint trial where the codefendant does not testify.[50]

*Marsh* set forth three alternatives for dealing with a codefendant's confession that implicates a defendant and is otherwise inadmissible against the defendant. First, the state can choose to try the two defendants separately.[51] Second, the state can choose not to introduce the confession.[52] Or, third, the state can alter the confession so it only implicates the codefendant and does not directly implicate the defendant and ask the court to give a limiting instruction.[53]

This court reviewed *Marsh* in *State v. McDonald*.[54] Because it found McDonald's confrontation clause argument unpersuasive under both views, this court declined to determine if the *Marsh* majority or dissent applies as a matter of constitutional law in Alaska.[55] In the present case, Roberts asks this court to adopt the view set forth in the *Marsh* dissent.

During trial, the state moved to admit a statement Pease made to John Heffle. According to Heffle's testimony, Heffle and Pease became friends while they were housed in the same dorm (along with the other codefendants) at the Fairbanks Correctional Center. Heffle contacted Fairbanks Police Detective Jim Geier to tell him Pease had made an incriminating statement about the murder of J.H. According to the state,

> Heffle ... felt Pease trusted him because he always gave Pease cigarettes. [Heffle] ... stated that one day they were smoking some marijuana that had been brought into the jail and were talking about what it would be like to serve a 99 year sentence. Heffle asked Pease if he really did it. Pease responded, "we were fucked up. It

45. *Marsh*, 481 U.S. at 207, 107 S.Ct. at 1707 (*citing Bruton*, 391 U.S. at 126, 88 S.Ct. at 1622).

46. 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

47. *Marsh*, 481 U.S. at 211, 107 S.Ct. at 1709.

48. *Id.* at 208, 107 S.Ct. at 1707–08 (citations and footnotes omitted).

49. *Id.* at 212, 107 S.Ct. at 1710 (Stevens, J., dissenting) (citations and footnotes omitted).

50. *Id.* at 214, 107 S.Ct. at 1711 (Stevens, J., dissenting) ("*Bruton* has always required trial

judges to answer the question whether a particular confession is or is not 'powerfully incriminating' on a case-by-case basis; they should follow the same analysis whether or not the defendant is actually named by his or her codefendant.").

51. *Id.* at 209, 107 S.Ct. at 1708.

52. *Id.* at 210, 107 S.Ct. at 1709.

53. *Id.* at 211, 107 S.Ct. at 1709.

54. 872 P.2d 627 (Alaska App.1994).

55. *Id.* at 647.

was bad." Detective Geier asked Heffle if they were talking about the murder that Pease was in jail for and Pease [sic] said "yes." Heffle said that he knew ... [the murder] was what they were referring to and that Pease did too. After Pease made the statement, Heffle said Pease walked away and became very quiet.

The state argued Pease's statement was admissible against Pease but recognized that this testimony was not admissible against Roberts [56] because it would violate Roberts's Sixth Amendment right to confront the witness who testified against him. The state suggested several options for admitting the statement without violating Roberts's Sixth Amendment rights. The state argued Roberts's rights would not be violated if the defendants' trials were severed or if the statement "we were fucked up" was paraphrased to "I (Pease) was fucked up" or "he (Pease) was fucked up." The state suggested that the better option was to paraphrase the statement and give a limiting instruction to assure the jury would not improperly use Pease's statement to implicate Roberts. The state argued that with the statement modified and the jury so instructed, the statement would not be "powerfully incriminating" of Roberts and the court would not have to sever the defendants' cases for trial. The state pointed out that Roberts had waived his Sixth Amendment rights to another incriminating statement made by Pease (Angela Harman's statement that Pease admitted that he attacked J.H. "for the punk's money") and that this statement to Heffle was less incriminating than that one.

Roberts argued the Heffle statement was inadmissible under the reasoning of the *Marsh* dissent. Roberts did not move for severance. Judge Esch followed the reasoning of the majority decision in *Marsh*. He allowed the state to introduce Heffle's redacted statement and instructed the jury not to use the statement against Roberts.

At trial, Heffle testified for the state. After establishing that Heffle and Pease were friends in jail, the state questioned Heffle as follows:

State: Do you remember one day having a pretty heavy conversation with [Pease]?

Heffle: Well, I don't—yeah. Yes.

State: And did you know what Mr. Pease was in custody for?

Heffle: Yes.

State: And you knew ...

Heffle: Accused of ...

State: ... that was murder charges, right?

Heffle: Yes.

State: And during this kind of heavy conversation, did you ask him if he did it?

Heffle: Yes.

State: Do you recall what he said?

Heffle: He didn't say yes, but he—he said, "I was fucked up and it was bad," and he walked away.

State: Okay.

Heffle: So I don't know how you take that.

State: When he walked away, how did he walk away, what did he do?

Heffle: Just walked away quietly, sat down, and watched TV or something. I can't remember exactly. I think he went and looked at TV.

State: Did that end the conversation?

Heffle: Yes.

After Heffle testified, Judge Esch instructed the jury:

Ladies and gentlemen, I'd like to instruct you that you heard ... a statement allegedly made by one of the defendants. You need to understand that you may consider that evidence against that defendant only and not as ... evidence against Mr. Roberts. So you're entitled to consider that as evidence against ... the defendant who allegedly made the statement.

Roberts argues this court should adopt the position of the *Richardson v. Marsh* dissent, which calls for a case-by-case analysis to determine whether a particular codefendant confession is "powerfully incriminating" regardless of whether the defendant is actually named by his codefendant in the out-of-court confession. Roberts argues that Heffle's testimony was "powerfully incriminating" be-

56. *See Bruton*, 391 U.S. at 126, 88 S.Ct. at 1623.

cause even though in its redacted form it only directly implicated Pease, the state's theory was (and other evidence at trial indicated) the four codefendants assaulted J.H. together. Therefore, if the jury concluded Pease murdered J.H., it would require the jury to also conclude that Roberts was involved.

 An appellant who contends that this court should construe the Alaska Constitution to grant defendants more rights than they have under analogous provisions of the United States Constitution bears a substantial burden.[57] Roberts has not met that burden. We recognize the force of the dissenting position in *Richardson v. Marsh:* In some cases a codefendant's confession could be so "powerfully incriminating" that even if the statement were redacted to exclude any reference to the defendant, it would be unreasonable to conclude that the jury would be able to follow the court's instruction to disregard the statement as to the defendant. But the facts of Roberts's case are not particularly compelling. In the first place, Roberts never moved to sever his trial from Pease's. Furthermore, pursuant to a *Bruton* waiver by Roberts, the state introduced another inculpatory statement by Pease. Angela Harman testified that while in jail she asked Pease why he had done it, referring to J.H.'s murder, and Pease told her he did it for the punk's money. Therefore, it does not appear that Roberts was particularly concerned about witnesses from the jail testifying that Pease made inculpatory statements. The inculpatory statement, as redacted by the court, referred only to Pease, and the court gave the jury a cautionary instruction. Although there was substantial evidence that Pease and Roberts were together during the incident, Roberts's defense was that at the time in question, he was not with Pease but was at the wedding reception at the Eagles Hall. If the jury believed Roberts's defense, Pease's statement only implicated Pease and not Roberts. We conclude that Roberts has not established a substantial basis for departing from the majority decision in *Richardson v. Marsh.* We conclude that Judge Esch did

not err in admitting Pease's hearsay statement.

*Whether Judge Esch erred in allowing the prosecutor to argue that codefendants Vent and Frese stated Roberts was not at the Eagles Hall but in the car*

Roberts's attorney cross-examined Fairbanks Police Detective Aaron Ring about Ring's investigation of Roberts's location at 1:30 a.m. Roberts's attorney asked Detective Ring whether he was concerned that witnesses reported Roberts dancing at the Eagles Hall at around 1:30 a.m. when the state's theory was that Roberts was with his codefendants at that time. Detective Ring replied that, although some people had stated that Roberts was at the Eagles Hall at 1:30, "other people have him doing other things." Roberts's attorney asked Ring who had Roberts "doing other things."

Roberts: Like Mr. Arlo Olson?

Det. Ring: And—and others.

Roberts: Right? Huh?

Det. Ring: And others.

Roberts: Who others? Just give me a name.

Det. Ring: Mr. Vent.

Roberts: Uh-huh.

Det. Ring: Mr. Frese.

Roberts: Uh-huh.

Det. Ring: I can't recall with specificity the other witnesses. Edgar Henry.

The parties presented no more evidence regarding statements by Vent or Frese.

Prior to closing arguments, Pease and Roberts applied for a protective order to prevent the state from implying that Vent or Frese had made admissions or confessions. The state argued that Roberts had "opened the door" by asking Detective Ring about the identity of the other witnesses who stated Roberts was in the car and not at the Eagles Hall. Based on Roberts's questioning of Detective Ring, the court allowed the state to argue that Vent and Frese had given information that Roberts was in the car.

During final arguments, the state argued:

---

**57.** *See Hosier v. State,* 976 P.2d 869, 870 (Alaska App.1999).

Then, Mr. Madson asked Detective Ring whether he's concerned about the time factor where Melanie Durham says, you know, it's after the Bowie show, and it's 1:30 or so, and you got all these other witnesses saying well, [Roberts's] someplace else dancing. And he asks Detective Ring about well, who else could put him anywhere.

The state then played a recording of the trial cross-examination of Detective Ring. During its rebuttal closing, the state said, "Again, Mr. Madson asked Mr. Ring, 'well, who puts [Roberts] in the car': 'Arlo, Edgar [Henry], Vent, and Frese.'"

■ Without citing legal authority, Pease and Roberts contend that the state argued an impermissible inference when the state argued that Vent and Frese stated Roberts was in the car. The defendants argue it is pure speculation to conclude from Detective Ring's testimony that all of the defendants were in the car together at the time of the assaults. They contend the jury could make this speculative conclusion based on the state's argument; that this conclusion is factually and legally incorrect; and, therefore, the state's argument was erroneous.

The evidence at trial tended to show that Roberts was either at the Eagles Hall at the time of the assaults or that he was in the car with his codefendants. A reasonable inference from Detective Ring's remarks was that Frese and Vent placed Roberts in the car at 1:30 a.m. Assuming Vent and Frese told Detective Ring that Roberts was in the car at 1:30 a.m., the state's comment was not fundamentally misleading.[58]

Pease and Roberts claim that this inference was "factually and legally incorrect." But they have not provided us with Detective Ring's interviews of Frese and Vent or provided any other basis suggesting that the inference the prosecution made from Detective Ring's testimony was misleading. Under these circumstances, we conclude that Judge Esch did not err in refusing to curtail the state's argument.

*Whether Judge Esch erred in admitting Exhibit D*

Exhibit D consists of a photo of the injuries on one side of J.H.'s face overlaid with inked impressions of Frese's shoe print on see-through plastic. Fairbanks Police Lieutenant David Kendrick, Detectives Brown and Ring, and the prosecutor, Jeffrey O'Bryant, prepared the exhibit.

Dr. Fallico, the pathologist who performed the autopsy on J.H., testified that the injuries on J.H.'s face were consistent with the tread pattern on Frese's shoe. He based his opinion on his notes—notes he had made from the exhibit while using it in a prior proceeding, autopsy information, other photos, and investigative information. Pease introduced Exhibit D during his cross-examination of Dr. Fallico. Both defendants cross-examined Dr. Fallico extensively on his qualifications to make footwear impression identification.

Pease's expert witness, Dr. John Thornton, disagreed with Dr. Fallico's opinion that the marks on J.H. matched the footwear pattern. He commented it was misleading to merely compare the tread design from the shoe to the injuries on J.H.'s face without considering the depth of the tread. Dr. Thornton testified that he and others in his laboratory had compared the marks on J.H.'s face with the shoes police seized, and no one concluded that the marks on J.H.'s face were consistent with the tread design on the shoes.

At the close of trial, the state moved to admit Exhibit D. Pease objected to its admission. Pease argued that Dr. Fallico did not create the overlay; the state did. He complained that he could not call the state's attorney to question him about the construction of the exhibit. Pease argued that although the overlay was the basis of Dr. Fallico's opinion, Dr. Fallico did not testify from it. Therefore, he concluded, it should not be admissible. Judge Esch admitted the overlay. He stated that Dr. Fallico had used the exhibit to form his opinion and that there had been extensive testimony about it during the trial.

---

**58.** *See Patterson v. State,* 747 P.2d 535, 538–41 (Alaska App.1987).

Pease and Roberts raise numerous arguments about why Judge Esch erred in admitting Exhibit D. But Pease used Exhibit D during his cross-examination of Dr. Fallico. And Pease presented an expert witness, Dr. John Thornton, who testified extensively about why Exhibit D gave an inaccurate impression. Given the extensive testimony about Exhibit D and the jury's exposure to it, we fail to see how admission of this evidence would have mislead the jury or would have had an appreciable impact on the jury's verdict. Therefore, we conclude that Judge Esch did not err in admitting Exhibit D. Furthermore, to the extent that there was any error in admitting Exhibit D, that error was harmless.

*Defendants' motions for judgment of acquittal and motions for a new trial*

Pease and Roberts contend that Judge Esch erred in denying their motions for judgment of acquittal. In reviewing a judge's denial of a motion for judgment of acquittal, this court considers only those facts in the record most favorable to the state and such reasonable inferences as the jury could have drawn from them.[59] "The question on review is . . . 'whether the finding of guilt is supported by substantial evidence[;]' "[60] that is, "whether reasonable jurors could differ on the issue of guilt."[61] Our review of the record convinces us that reasonable jurors could have convicted Pease and Roberts of the charges in question.

The standard for a motion for a new trial is different. On this issue, the trial court was authorized to weigh the evidence and determine the credibility of the witnesses.[62] The decision of whether to grant a motion for a new trial under Alaska Criminal Rule 33 is committed to the discretion of the trial court.[63] This court is to reverse the trial judge's decision on this issue "only if it is unsupported by evidence or was based on

an incorrect application of the law."[64] Especially when the credibility of witnesses is at issue, this court "must give broad deference to the trial judge's ability to observe the demeanor of witnesses, to form firsthand impressions of their credibility, and to decide the weight that should be given to their testimony."[65]

We have reviewed Judge Esch's findings denying the motion for a new trial. We conclude that Judge Esch did not abuse his discretion.

*Restitution*

The state requested $18,696.66 in restitution to be paid to Evelyn Thomas, J.H.'s mother. The state submitted copies of seven bills and statements from Thomas in support of its request and an explanation of those charges. On May 30, 2000, Judge Esch held a restitution hearing. The state itemized its $18,696.66 reimbursement request. And, Thomas testified regarding the itemized requests for reimbursement. At the conclusion of the hearing, Judge Esch ordered $1,774 to be paid for J.H.'s funeral and miscellaneous expenses. He also ordered $16,842.66 to be paid to the Violent Crimes Compensation Commission (Commission).

Roberts and Pease argue Thomas's testimony that the Commission paid particular bills is insufficient to establish what medical bills the Commission paid. Based on this argument, they contend this court should find Judge Esch erred in ordering restitution to be paid to the Commission.

The state argues the evidence on the record viewed in the light most favorable to the state shows the Commission paid $16,442.66. The state concedes that the order of $16,842.66 is incorrect.

**59.** *See Dorman v. State,* 622 P.2d 448, 453 (Alaska 1981).

**60.** *Id.*

**61.** *New v. State,* 714 P.2d 378, 381 (Alaska App. 1986).

**62.** *Id.* at 381–82.

**63.** *Maloney v. State,* 667 P.2d 1258, 1267 (Alaska App.1983).

**64.** *New,* 714 P.2d at 381–82.

**65.** *Maloney,* 667 P.2d at 1267.

■ The state's concession of unexplained error appears to be well-founded.[66] The testimony indicated that the Commission paid the following expenses:

1) $2237 to the Fairbanks Clinic
2) $850 ($600 & $250) to the Fairbanks Psychiatric and Neurological Clinic
3) $62 to ANHC
4) $2643.79 to FMH for the neurologic brain surgeon
5) $10,206.87 to FMH
6) $443 to Radiology Consultants

Total: $16,442.66

■ The state therefore asks us to remand the restitution issue to Judge Esch for redetermination. We conclude that this matter should be remanded to the superior court to reconsider restitution in light of the state's concession. Because the restitution issue is being remanded, on remand, the parties will have the opportunity to reexamine the evidence in support of restitution.

*Conclusion*

Having reviewed the defendants' claims of error, we AFFIRM the convictions. We REMAND the restitution issue to the trial court for reconsideration.

---

66. *See Marks v. State,* 496 P.2d 66, 67–68 (Alaska 1972). A concession of error by the state is not determinative of the issue because "[t]he public interest in criminal appeals does not permit their disposition by party stipulation." *Id.* When the state concedes error, this court must independently review the record to ensure that the alleged error exists and that it has a legal foundation.