**Charles E. COLLINS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–9551.**

Court of Appeals of Alaska.

May 16, 2008.

---

Dan S. Bair, Assistant Public Advocate, and Joshua Fink, Public Advocate, Anchorage, for the Appellant.

Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

STEWART, Judge.

Charles E. Collins was convicted of murder in the first degree and tampering with physical evidence.[1] Collins appeals, arguing that the superior court twice violated his right to be present at all stages of his trial. The State concedes for purposes of this appeal that Collins should have been present at both stages, but argues that the errors were harmless beyond a reasonable doubt. Because we agree with the State that Collins's absence from each proceeding was harmless beyond a reasonable doubt, we affirm the superior court.

*Background facts and proceedings*

In early October 2002, Cynthia Barnes, Collins's girlfriend, was the victim of a homicide. The State charged Collins with alternative counts of first-and second-degree murder for the homicide and tampering with physical evidence for manipulating the crime scene (Barnes's Mountain View apartment) in an attempt to conceal the homicide.

At the time of the homicide, Collins lived with Barnes at her apartment. At trial, Collins's theory of the case was that Barnes was killed by a previous boyfriend, Devon Spencer, or by an unknown intruder from the criminal milieu of Mountain View, and that the intruder, whether Spencer or an unknown person, likely entered through Barnes's unlocked bedroom window. To support this theory, the defense relied heavily on an unidentified footprint found outside Barnes's unlocked bedroom window.

Several days into trial, Superior Court Judge Larry D. Card informed the parties that he had excused a member of the jury. Judge Card reported that the juror was too

1. AS 11.41.100(a)(1)(A), and AS 11.56.610(a)(1), respectively.

ill to continue, but because there were thirteen jurors remaining, he decided to excuse the juror without consulting the parties. Collins objected to the court's decision to release the juror without consulting the defense.

The next incident took place after the jury began deliberations. After final arguments, Judge Card discussed the procedure if the jury had questions for the court or if the jury requested a playback of testimony. Judge Card noted that Collins would be in the courthouse holding area every day during jury deliberations. He asked Collins's attorney if Collins wished to be present for playbacks, and his attorney replied that he did. Judge Card asked if Collins wished to be present for jury questions. The attorney replied that she and Collins had agreed that he need not be present for any "administrative" decisions, but that he wished to be present for "substantive" decisions. Judge Card concluded that Collins wished to be present unless his attorney told the court otherwise. Collins's attorney agreed.

The next morning, September 29, 2005, the parties appeared in court to discuss a request from the jury. After resolving that request, Collins's attorney told the court that the previous night's six o'clock television news on Channel 2 had a story about Collins's trial. The attorney explained that she checked the content of the story by accessing the station's internet news library after her paralegal told her about the report.

According to the defense attorney, the report on the six o'clock news included a synopsis of her theory of the case: "open window, a high crime area, and a footprint right in front of the window." The story also included a statement from Francis Thiele, Barnes's best friend and one of the State's main witnesses, asserting that it was her footprint—and not the footprint of an intruder—that was found outside of Barnes's bedroom window. This information was not presented at Collins's trial. At trial, Thiele testified that she knocked on Barnes's apartment door and living room window before calling the police, but she never mentioned that it was her footprint by Barnes's bedroom window.

The defense attorney asked Judge Card to poll the jury to find out "whether anyone saw this directly, someone mentioned it to them, anything like that." Judge Card agreed to send a written inquiry to each juror explaining that there was a Channel 2 television news broadcast about the case on the evening of closing arguments. Collins's attorney did not know if the station also broadcast the story on the ten o'clock news, so the inquiry did not indicate the specific time of the broadcast. The note inquired whether any jurors had been exposed to the broadcast, and each juror was to respond by putting a check on a line next to the statement "Was exposed," or next to the statement "Was not exposed." Collins was present for this stage of the proceedings.

Thirty minutes later, Collins was not present in court when Judge Card informed the attorneys that he was about to summon one of the jurors into the courtroom because "it appears [she] heard something on the radio."

Judge Card asked the defense attorney if she "wish[ed] to waive [Collins's] presence[.]"

The attorney replied:

I have—I do, Judge. I—we've discussed—he and I have discussed for this kind of [ministerial] kind of thing, which I—hopefully is what this is—that he doesn't need to be here, and I think he—I don't think he would have a problem with it.

Judge Card assured the defense attorney that he would not take up anything "substantive ... about the law."

Judge Card told both counsel that he would question the juror about her answer to the inquiry, and then excuse the juror from the courtroom. Then he would discuss with counsel what to do after the juror left.

The juror was brought into the courtroom and Judge Card questioned her as follows:

*The Court:* I got your comment, and your comment says "heard on radio" ... [then it] looks like it says "turned down."

*The juror:* Yeah, I turned the channel.

*The Court:* Turned channel. Oh, turned channel.

*The juror:* Whenever I left here yesterday, I was listening to Dan Fagin and it turned into the news and then—

*The Court:* Oh, it went to the news at 5 o'clock?

*The juror:* Yes. And I turned it off—

*The Court:* You didn't hear anything?

*The juror:* [O]r turned the channel.

*The Court:* And you followed the Court's instructions?

*The juror:* I heard that—I heard that—yes, that it was coming on, and I turned it.

*The Court:* Okay. So you followed the Court's instruction I'd given about not to listen to any news programs?

*The juror:* Yes. Yes.

Judge Card thanked the juror and dismissed her from the courtroom. He found that

> [s]he was listening to the radio, and the Dan Fagin show comes on 750 on the radio, and then there's a joint broadcast of news and television, I think, at Channel 2 on [the] 5:00 o'clock news. But in any case, she said she heard what it was about, she turned it—she said channel so I assume it's station. So she heard nothing, and she indicated she followed the Court's instructions.

Judge Card asked the attorneys whether they had any questions they wanted to ask to the juror. Both attorneys indicated they had no additional questions.

The jury returned guilty verdicts the following afternoon, September 30, 2005. At sentencing, Judge Card merged the first- and second-degree murder convictions and imposed a 99–year term. He imposed a concurrent 3–year term for tampering with evidence. Collins appeals.

### Discussion

Collins argues that his right to be present was violated twice in the course of his trial.

First, he argues that Judge Card's communication with the ill juror, and his decision to release the juror without notice, violated his right to be present. Second, Collins argues that his right to be present was violated when Judge Card did not ensure that he was in the courtroom for the questioning of the juror who indicated exposure to the Channel 2 news story.

The State does not dispute that in each instance Collins's right to be present was violated. However, the State contends that each error was harmless beyond a reasonable doubt.

Under both the United States Constitution and the Alaska Constitution, a defendant has the right to be present at every stage of the trial. In addition, the right to be present at trial is implemented by Alaska Criminal Rule 38(a). Criminal Rule 38(a) provides as follows:

> The defendant shall be present at the arraignment, at the preliminary hearing, at the time of plea, and the omnibus hearing, and at every stage of the trial, including the impaneling of the jury and return of the verdict, and at the imposition of sentence, except as otherwise provided in this rule.

■ The right defined in Rule 38(a) is broader than the right to be present arising from the constitutional guarantees of the right to confrontation and to due process.[2] An accused may waive his right to be present, but "the defendant must personally waive his right to be present or expressly consent to allow the proceeding to occur outside his presence."[3]

*The decision to release the juror who was ill*

■ In *Huff v. State*,[4] the superior court excused a juror when the juror informed the court that the juror's husband was in the intensive care unit of the hospital and the

---

**2.** See *Raphael v. State,* 994 P.2d 1004, 1011 (Alaska 2000) (citing *Henry v. State,* 861 P.2d 582, 593 (Alaska App.1993)).

**3.** *Pease v. State,* 54 P.3d 316, 324–25 (Alaska App.2002) (citing *Dixon v. State,* 605 P.2d 882, 885 n. 8 (Alaska 1980)).

**4.** 598 P.2d 928 (Alaska 1979).

juror needed to be with him.[5] Huff claimed that the superior court violated his right to be present when the court discharged the juror outside his presence.[6] The supreme court rejected Huff's claim, noting that "[s]ituations may sometimes arise when a respect for the rights of jurors will require the judge to take immediate action without consulting counsel."[7] The court ruled that in these instances, the superior court has "the sound discretion" to replace the juror, and the court concluded that the superior court did not abuse its discretion.[8]

Collins points to *Coney v. State,*[9] where the trial court excused a juror after determining that it would amount to "extreme hardship" if the juror was not released to pursue an employment opportunity.[10] On appeal, this court distinguished a juror's economic concern from the medical emergency present in *Huff* and concluded that, under those circumstances, it was error for the judge to excuse the juror in the absence of the defendant.[11] Even so, Huff's conviction was upheld for the following reasons: the superior court had a legitimate reason to dismiss the juror; the superior court concluded that the juror would have had trouble giving his full attention to the case; it was highly unlikely that the superior court would have reached a different decision if the defendant had been present; and there was no reason to believe that the result of the trial would have been different if the juror who was excused had been present for deliberation instead of the alternate.[12]

Collins does not argue any specific prejudice arising from the superior court's decision. Even if the juror had not been excused, there was no certainty that the juror would have deliberated on the case because Judge Card did not select the twelve jurors who did deliberate from the remaining members of the panel until after the close of evidence. Furthermore, the juror's illness

was a legitimate reason for dismissing a juror, and there is nothing in the record that suggests that the presence of Collins and his attorney would have convinced Judge Card to reach a different decision. Therefore, we agree with the State that the failure to have Collins present for the decision to release the ill juror was harmless beyond a reasonable doubt.

*The inquiry of the juror about media exposure*

■ We now turn to Collins's claim regarding Judge Card's inquiry, outside Collins's presence, of the juror who responded to the question about media exposure. Collins argues that this was an important and substantive stage of the trial, that he did not waive his presence, that it was error for the superior court to proceed in his absence, and that his absence was not harmless beyond a reasonable doubt. Collins submits that he may have been able to convince his attorney to have Judge Card ask the juror an additional explicit question: whether the juror heard anything substantive from the news story before turning the station. Collins also maintains that the transcript of Judge Card's inquiry shows that Judge Card repeatedly interrupted the juror and that Judge Card's questioning "carried a coercive element."

As reflected in the transcript set out above, it is true that the superior court did not ask the juror explicitly if she had heard anything of substance before she changed the station. It is also possible to read the transcript of Judge Card's inquiry of the juror in a way that supports Collins's argument. Collins contends that the superior court obtained the juror's agreement that she obeyed the court's admonishment to avoid media about the case, while overlooking the central question of whether the juror actually heard any of the story. But in addition to examining the transcript, we have reviewed

**5.** *Id.* at 931.

**6.** *Id.*

**7.** *Id.* at 932.

**8.** *Id.*

**9.** 699 P.2d 899 (Alaska App.1985).

**10.** *Id.* at 902.

**11.** *Id.* at 903.

**12.** *Id.* at 904.

the electronic recording of the proceeding. The tone, the pace, and the tenor of the interchange between Judge Card and the juror lead us to conclude that the questioning was not coercive and that Judge Card reasonably found that the juror had not been exposed to any extra-judicial information.

In context, the juror's clear response seems to be that she heard the news was about to come on, but changed the station before it did. This conclusion is bolstered by the fact that Collins's attorney did not wish to put any additional questions to the juror when asked by Judge Card if she had any questions for the juror. Therefore, it appears that the defense attorney also concluded that the juror testified that she changed the station before the news story came on.

Against this backdrop, we are satisfied that Collins's absence from the questioning of the juror was harmless beyond a reasonable doubt.

### Conclusion

The judgment of the superior court is AF-FIRMED.

MANNHEIMER, Judge, concurring.

I write separately to address an issue that does not receive substantive discussion in the majority opinion: the question of whether it was error for Judge Card to *voir dire* the juror about her potential exposure to extra-judicial information about Collins's case without Collins being personally present.

As explained in the majority opinion, Collins and his attorney discussed whether Collins wanted to be present at any court proceedings that might be held during jury deliberations. The defense attorney informed Judge Card that Collins had agreed that the attorney could respond to "administerial" matters—apparently, "administrative" and/or "ministerial" matters—without Collins being present, but that Collins wished to be personally present for all other proceedings.

As explained in the majority opinion, Judge Card notified the parties that one of the jurors had potentially been exposed to prejudicial extra-judicial information about the case, and the judge told the parties that he intended to question the juror on this subject. Surprisingly, Collins's attorney declared that Collins did not need to attend this *voir dire* because it would be an "administerial kind of thing." Equally surprisingly, Judge Card concurred in this assessment.

The Alaska Supreme Court's decision in *Huff v. State*, 598 P.2d 928, 931–32 (Alaska 1979), indicates that a criminal defendant does not need to be present when the trial judge hears from a juror, or questions a juror, about certain emergency matters that affect the juror's ability to continue serving. But this Court's later decision in *Coney v. State*, 699 P.2d 899, 903 (Alaska App.1985), clarifies that *Huff* is an exception to the normal rule—the rule that a defendant has the right to be personally present when the trial judge hears from a juror, or questions a juror, regarding their desire and/or ability to continue serving.

It follows that a defendant must also have the right to be present when a trial judge hears from a juror, or questions a juror, regarding matters that would affect the juror's ability to render a fair and legally proper verdict.

This, in itself, does not provide a complete answer to Collins's case, because we have the additional complicating factor that Collins declared that he was willing to waive his right to be present for "administerial" matters. Thus, the remaining issue is whether Judge Card and Collins's defense attorney might reasonably conclude that the matter they were about to engage in—to wit, questioning a juror to see if the juror heard extra-judicial information in a news broadcast that could potentially affect the juror's consideration of the evidence—was administrative or ministerial.

I conclude that this inquiry was substantive, and that it was error for the defense attorney and the trial judge to categorize this inquiry as merely administrative or ministerial.

In *Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983), the United States Supreme Court assumed without deciding (based on the State of California's

concession of error [1]) that a defendant has a constitutional right to be present whenever a trial judge and a juror communicate concerning a potential ground for challenging the juror's impartiality.[2] Since then, several courts have explicitly adopted this implicit premise of *Spain:* that a judge-juror communication is administrative or ministerial only when it is "wholly unrelated to the substantive legal or factual issues of the trial", *People v. Harris,* 76 N.Y.2d 810, 559 N.Y.S.2d 966, 559 N.E.2d 660, 662 (1990)—and that such a communication is substantive if "the trial court's response could influence the jury", *Hernandez v. State,* 761 N.E.2d 845, 850 (Ind.2002), or if the discussion involves "any fact in controversy or any law applicable to the case", *Randolph v. State,* 117 Nev. 970, 36 P.3d 424, 437 (2001).

Using these definitions, the trial judge's examination of the juror in Collins's case was substantive, not administrative or ministerial. Accordingly, Collins's conviction must be reversed unless this Court is convinced that the error was harmless beyond a reasonable doubt.

Collins argues that Judge Card examined the juror in a peremptory manner, and that the judge employed leading questions in such a way as to encourage the juror to deny receiving any extra-judicial information. I concede that, when I read the transcript of the *voir dire,* I believed that it could reasonably be interpreted to support Collins's argument.

However, to better resolve the issue, we directed the Clerk's Office to provide us with a copy of the audio recording of the *voir dire.* After listening to this audio recording, I concur in the description of the *voir dire* offered by Judge Stewart in the majority opinion: "[t]he tone, . . . pace, and . . . tenor of the interchange between Judge Card and the juror" demonstrate that "the questioning was not coercive and that [the judge] reasonably found that the juror had not been exposed to any extra-judicial information."

For these reasons, I concur in the decision to affirm the judgement of the superior court.

---

**1.** 464 U.S. at 117 n. 2, 104 S.Ct. at 455 n. 2.

**2.** 464 U.S. at 120–22, 104 S.Ct. at 456–57.