Leonard J. HOFFMAN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–6047.

Court of Appeals of Alaska.

Dec. 19, 1997.

Carmen L. Gutierrez, Anchorage, for Appellant.

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, C.J., and
MANNHEIMER and STEWART, JJ.

## OPINION

COATS, Chief Judge.

Leonard J. Hoffman was convicted by a jury of four counts of tampering with a witness in the first degree, AS 11.56.540(a)(1) or (2) & AS 11.16.110(2)(A) or (B), four counts of interference with an official proceeding, AS 11.56.510(a)(1)(A) or (D) & AS 11.16.110(2)(A) or (B), arson in the first degree, AS 11.46.400(a) & AS 11.16.110(2)(A) or (B), assault in the third degree, AS 11.41.220(a)(1), and four counts of sexual assault in the first degree, AS 11.41.410(a)(1). On appeal, Hoffman raises two issues: first, he asserts that the trial court erred by communicating with the jury outside the presence of Hoffman and his counsel; second, he contends that the trial court erred by admitting evidence of an assault which Hoffman allegedly committed prior to committing the assault and sexual assaults for which he was ultimately convicted. We affirm.

At around midnight on October 12, 1993, Hoffman knocked on the door of the residence of M.B. M.B. had known Hoffman for about five years and had engaged in acts of prostitution with him on previous occasions. When M.B. answered the door she was wearing only a negligee and a pair of satin underwear. Since M.B. was acquainted with Hoffman, she let him inside. Once inside, Hoffman asked M.B. if anyone else was present; after M.B. answered "no" Hoffman put one hand over M.B.'s mouth and wielded a knife with the other hand. A struggle ensued during which Hoffman shoved M.B.'s face into a couch and told her that he was going to "stick" her. During this struggle, M.B. scratched Hoffman's face. Hoffman then ripped M.B.'s underwear off and tried to tie the underwear around her head and then tried to stuff it in her mouth. After he was unsuccessful in stuffing M.B.'s underwear in her mouth, Hoffman ceased the attack and began talking to M.B.

After the attack, Hoffman told M.B. that he always paid before and that he had never done anything like this before. He also told M.B. that he had just killed a couple of black people and that they beat him up with a baseball bat. M.B. then asked Hoffman to leave. In response, Hoffman asked for M.B.'s car keys. After M.B. gave Hoffman her keys, Hoffman told M.B. that he would leave her car at the Carrs Aurora Center, and M.B. agreed not to call the police. After Hoffman left with her car, M.B. walked to the Carrs Aurora Center. When M.B. did not find her car at the center, she called the police and reported the assault, identifying Hoffman as her attacker.

Later in the early morning of October 13, 1993, K.V. was awakened by a knock on the door of her residence. K.V. looked out the window and saw Hoffman standing outside. K.V. knew Hoffman because he had dated K.V.'s sister. Hoffman "looked like he'd been in a fight" and asked K.V. to let him in to use her phone. Hoffman stated, "Help me, open the door, is your sister home, some niggers beat me up, I think my arm is broken." K.V. then opened the door and let Hoffman in.

Once inside K.V.'s trailer, Hoffman asked K.V. to get him some hydrogen peroxide and an Ace bandage; K.V. retrieved these items while Hoffman used the phone. K.V. noticed that Hoffman had a scratch under his eye and appeared to have a hurt wrist. While K.V. wrapped Hoffman's wrist with the bandage, Hoffman was saying "those f-ing niggers, those f-ing niggers." Hoffman was upset, dripping with sweat, and pacing back and forth. K.V. talked with Hoffman and tried to calm him down. Hoffman then asked K.V. if he could use the bathroom. Because K.V. had become leery of Hoffman, she told him that he shouldn't use the bathroom because her boyfriend was in the back room. However, Hoffman disregarded K.V.'s instructions and walked to the back room. After seeing that no one else was in the trailer, Hoffman indicated to K.V. that he was upset that she had lied to him. K.V. responded by asking Hoffman to leave; Hoffman agreed and began to walk out of the trailer.

As K.V. followed Hoffman out of the trailer, Hoffman turned around, grabbed K.V. with his hand over her mouth, threw her onto

the daybed and got on top of her. Hoffman then ripped off K.V.'s clothes and took a knife out of his back pocket. After he bound K.V.'s wrists Hoffman picked K.V. up and pushed her into another room. While holding the knife, Hoffman then forced K.V. to perform fellatio on him. Subsequently, Hoffman forcibly penetrated K.V.'s rectum and vagina with his fingers, attempted to penetrate her rectum with his penis, and forcibly penetrated her vagina with his penis. Throughout this attack Hoffman hit and slapped K.V., pinched and twisted her breasts, and ran the knife back and forth across her naked body.

After the attack, K.V. asked Hoffman if he was hungry. Hoffman answered that he was hungry and K.V. followed him to the kitchen. K.V. then placed a TV dinner in the microwave. While Hoffman looked in the freezer for more food, K.V. ran out of her home to a neighbor's house where she called 911.

Shortly thereafter, the police arrived on the scene. After K.V. went to the hospital, she returned to her residence to obtain some clothing. While K.V. was gathering her clothes, she found two pair of panties which were not hers on her daybed. M.B. had purchased these items the previous day and had left them in her car. K.V. testified that she found Hoffman's jacket with M.B.'s car keys and house keys in the pocket. K.V. also testified that M.B.'s car was in K.V.'s driveway.

Hoffman was arrested on October 15, 1993, and remained incarcerated pending trial. While in jail, Hoffman called William Lopez and Gilbert Montiel and asked them to make threatening calls to K.V. in order to keep her from testifying. Per Hoffman's instructions, on November 22, 1993, Lopez made three threatening phone calls to K.V.

In late November 1993, Hoffman called Shannon Kennington and offered him a gram of heroin to shoot at M.B.'s trailer. Kennington accepted Hoffman's offer and in late November or early December, 1993, Kennington fired five or six shots into what he thought was M.B.'s trailer. However, Kennington fired the shots into the trailer next to M.B.'s trailer.

After the shooting, Hoffman continued to ask Kennington, Montiel and Lopez to intimidate K.V. and M.B. On December 11, 1993, M.B.'s neighbor found a burnt out Molotov cocktail in the driveway between his trailer and M.B.'s trailer. Two days later, M.B. found a partly burned Molotov cocktail in front of her trailer. On January 6, 1994, at Hoffman's request, Montiel and Lopez threw a Molotov cocktail through K.V.'s living room window. Finally, on April 11, 1994, Hoffman offered Kennington $1000 to firebomb M.B.'s trailer.

On October 26, 1993, the grand jury returned a seven-count indictment (3AN–S93–7782CR) against Hoffman. Counts I and II charged Hoffman with assault in the third degree and assault in the fourth degree; these charges arose from his assault on M.B. Count III charged Hoffman with assault in the third degree against K.V. and counts IV through VII charged him with sexual assault in the first degree against K.V.

On May 4, 1994, a grand jury returned a nine-count indictment against Hoffman. Counts I, II and III charged Hoffman with tampering with a witness in the first degree for attempting to influence the testimony of M.B. on three occasions in late 1993. Count IV charged Hoffman with tampering with a witness in the first degree for attempting to influence the testimony of K.V. on January 6, 1994. Counts V through VIII charged Hoffman with interference with official proceedings for attempting to influence the testimony of M.B. and K.V. on four occasions between November 1993 and January 6, 1994. Finally, Count IX charged Hoffman with arson in the first degree for the firebombing of K.V.'s residence on January 6, 1994.

On May 9, 1994, the state moved to join the two indictments for trial. Hoffman opposed joinder of the indictments. Judge Hunt granted the state's motion to join the two indictments; however, Judge Hunt ordered the assault counts pertaining to M.B. severed from those pertaining to K.V.

On October 12, 1994, Hoffman filed a motion *in limine* seeking to exclude evidence of the assault on M.B. from the trial for the assault on K.V. On December 16, 1994, Judge

Hunt denied this motion and ruled that evidence of the assault on M.B. was admissible to show Hoffman's state of mind at the time of the assault on K.V.

The trial on the charges involving assaults against K.V. and the charges in the second indictment were joined but bifurcated. Thus, the jury first deliberated on the sexual assault and assault charges involving K.V. The jury then considered additional evidence pertaining to the second indictment and deliberated on those charges. Hoffman was never tried for the alleged assault on M.B. and those charges were dismissed.

At the first stage of the trial, M.B. testified as a witness for the state. M.B.'s testimony described Hoffman's attack on her in detail. Subsequently, Judge Hunt instructed the jury to consider M.B.'s testimony for the limited purposes of testimonial completeness and establishing Hoffman's state of mind.

After the conclusion of the first stage of the trial, the jury began its deliberations at around 3:00 p.m. on February 16, 1995. The following discussion occurred immediately after the jury was excused for deliberations in the first phase of the trial:

THE COURT: Okay. Whenever I get anything out from the jury that touches on the merits of the case, or touches on their deliberations on the case, then my intent will be that I will call each counsel and call for Mr. Hoffman, we'll go on record, we'll resolve it and then proceed. Any comments? . . . Does the defendant and does the state waive presence during any playback which may be requested?

PROSECUTOR: The state does waive.

. . . .

DEFENSE COUNSEL: Your Honor, I've discussed this with Mr. Hoffman and he will waive appearances, however, I would like to be notified when there are playback. THE COURT: [W]hat I'll do then, since nobody wants to be here, I'll just have my staff call and tell you that playback of such and such and so and so. . . .

On February 17, 1995, at 10:14 a.m., the court received a note from the jury. The jury's note read as follows: "We would like to rehear K.V.'s testimony along [with] log notes[.] If at all possible—we would also like to listen to Copeland and Dr. Riley[.]" Six minutes later, without notifying counsel or Hoffman, Judge Hunt responded, "[a]s soon as we can arrange a courtroom, you can rehear K.V.'s testimony (10–12 hrs) Copeland's testimony (1–[1.5] hrs) and Dr. Ripley's testimony (45 min–60). Because of maintenance going on in the courthouse, you may be moved around." At 11:00 a.m., before the jury had started to listen to any playbacks, the jury issued a second note informing the court that they had reached a verdict on all counts. The jury convicted Hoffman of counts III through VII in case No. 3AN–S93–7782CR.

Before the second phase of the trial began, Hoffman's attorney expressed to the court her concern that she was not informed of the communication between the court and the jury. She also asked that the court provide a copy of the note between the judge and the jury. However, she never asked for a mistrial or for any other remedy.

After hearing additional evidence, the jury began deliberations on the charges in the second indictment. Subsequently, the jury convicted Hoffman of all nine counts. Hoffman now claims that Judge Hunt committed error when she responded to the jury's playback request without consulting Hoffman or his attorney.

In *Dixon v. State*, 605 P.2d 882, 884 (Alaska 1980), the court stated:

Under both the United States Constitution and the Alaska Constitution the right of the defendant to be present at every stage of the trial has been recognized. Included within the scope of this right is the period of jury deliberations; thus, the defendant has the right to be present whenever any communication between the court and the jury occurs during those deliberations. In Alaska, this constitutional right has been further implemented by the provisions of Criminal Rule 38(a).

(Footnotes omitted.)

Alaska Criminal Rule 38 provides in pertinent part:

**Rule 38. Presence of the Defendant.**

(a) **Presence: Required.** The defendant shall be present at the arraignment, at the preliminary hearing, at the time of plea, at the omnibus hearing, and at every stage of the trial, including the impaneling of the jury and return of the verdict, and at the imposition of sentence, except as otherwise provided in this rule.

(b) **Continued Presence Not Required.** The further progress of the trial to and including the return of the verdict shall not be prevented whenever a defendant, initially present:

(1) Is absent voluntarily after the trial has commenced[.]

■ When the trial court communicates with the jury in violation of the defendant's right to be present at every stage of the trial we are to reverse the conviction unless we find the error is harmless beyond a reasonable doubt. *Dixon,* 605 P.2d at 884.

■ The state contends that Hoffman waived his right to be present at jury playbacks, and therefore Judge Hunt did not err in communicating with the jury. However, we do not lightly infer the waiver of an important constitutional right. *See Wilson v. State,* 680 P.2d 1173, 1176 (Alaska App.1984). The record of the discussion which occurred immediately after the jury was excused for deliberations after the first phase of the trial shows that Hoffman waived the right to be present during the playbacks. However, that waiver did not authorize Judge Hunt to communicate with the jury in his absence. Therefore, Judge Hunt erred when she communicated with the jury.

■ The next question which we must answer is whether this error was harmless beyond a reasonable doubt. Hoffman cites *Cox v. State,* 575 P.2d 297, (Alaska 1978) and *Dixon v. State,* 605 P.2d 882 (Alaska 1980), in support of his contention that the error was not harmless.

The defendant in *Cox* was tried for assault with intent to commit rape. The defendant relied on the defense of alibi. To support this defense, the defendant presented the testimony of two alibi witnesses. *Cox,* 575 P.2d at 298–99. One hour after the jury began deliberations, the jury requested play-

back of the testimony of these two witnesses. The trial judge denied this request and informed the jury that they could renew their request at a later time. *Id.* The jury subsequently convicted Cox without listening to the playbacks. Neither Cox nor his attorney learned of the request until after the verdict. *Id.* at 298. The court reversed Cox's conviction, holding that Cox was denied his right to be present at every stage of the trial. The court concluded that the error was not harmless beyond a reasonable doubt. *Id.* at 300–01.

In *Dixon,* the defendant was tried on charges of rape. Dixon presented a defense of consent. To a large extent, the result of the trial rested on the jury's assessment of whether Dixon or the complaining witness was more credible. 605 P.2d at 888. Shortly after deliberations began, the jury requested playbacks of the victim's and the defendant's testimony. Without consulting Dixon or either counsel, the trial judge sent a note to the jury stating that he would not allow the jury to hear all of the requested testimony again, but he would allow them to hear a portion of the testimony. *Id.* at 883. One hour later the jury sent a note stating, "We need nothing more at this time apparently. Thank you[.]" Without hearing the requested testimony, the jury returned a verdict of guilty five hours later. *Id.* at 883–84. On appeal, the state conceded, and the court found, that the trial court's communication was error. *Id.* at 884. The court also found that the error was not harmless beyond a reasonable doubt and accordingly reversed Dixon's conviction. *Id.* at 889.

In *Dixon* the court stated:

The trial judge's response, informing the jury that he could not allow them to hear "all of the testimony of a witness to be replayed" and suggesting that the jury narrow its request, may have caused the jury to abandon that request, particularly as it may have placed considerable pressure on the minority of two members of the panel who apparently initiated the request. Had the defendant been present and his counsel allowed the chance to influence the trial court's decision, the trial court might have been persuaded to allow

the jury's request or to phrase his preference for a narrower request in less absolute terms. While we do not reach the question whether the trial court's response in itself amounted to an abuse of discretion, we hold that in the circumstances presented here the superior court committed reversible error by responding to the jury's request out of the presence of and without consultation with the defendant and his attorney.

*Id.* at 888–89 (footnotes omitted).

Hoffman contends that Judge Hunt's response to the jury, in which she informed the jury of the length of the testimony which the jury had requested and in which she indicated that the jury would face some logistical difficulties because of the "maintenance going on in the courthouse," tended to discourage the jury from hearing the requested testimony. Hoffman contends that his case is therefore factually similar to *Cox* and *Dixon*. We disagree. In *Cox* and *Dixon*, the trial judges' responses to the jury could have discouraged the jury from listening to the requested testimony. However, in Hoffman's case, the jury asked to hear the testimony of K.V., Copeland, and Dr. Ripley. Judge Hunt's communication granted the jury's request. Although Judge Hunt's response notified the jury of the length of the requested testimony, the jury was certainly aware of the approximate length of testimony which they requested. The jury had been present in court when these witnesses testified. In fact, the testimony of the witnesses was in all probability much more lengthy when it was originally given, given the recesses and delays necessary to present live testimony. We therefore conclude that even though Judge Hunt's note informed the jury of the anticipated length of the replay, there was no reasonable possibility that this information discouraged or deterred the jury from pursuing its request. We also note that nothing in Judge Hunt's response prevented the jury from narrowing their request.[1]

■ We also fail to see that informing the jury that they might have to be moved at some point because of maintenance in the courthouse would have an adverse influence on the jury's decision to listen to testimony of the requested witnesses. We accordingly conclude that the *Cox* and *Dixon* cases are distinguishable and conclude that Judge Hunt's communication with the jury, though error, was harmless error beyond a reasonable doubt.[2]

■ Hoffman contends that the trial court committed reversible error by admitting evidence of the assault on M.B. in the trial for the sexual assault on K.V. Hoffman asserts that this evidence was not relevant for any purpose other than to show propensity and therefore was inadmissible under A.R.E. 404(b). The state counters that M.B.'s testimony was admissible to show Hoffman's state of mind at the time of the attack on K.V.

■ "The admissibility of evidence is largely within the trial court's discretion and its rulings will not be overturned on appeal in the absence of an abuse of discretion." *Hawley v. State*, 614 P.2d 1349, 1361 (Alaska 1980); *M.R.S. v. State*, 897 P.2d 63, 66 (Alaska 1995). Evaluating the admissibility of "other acts evidence" consists of a two-step analysis. First, under 404(b)(1) the court

1. Out of the presence of the jury, just as deliberations were starting, Judge Hunt informed the parties that it was her policy to require a jury to hear the complete testimony of any requested witness. If the jury in Hoffman's case had requested only a partial replay of any witness's testimony, then any communication of this "all or nothing" policy could have had the effect of discouraging the jury from pursuing its request for playbacks. If Judge Hunt had sent such a communication to the jury without consulting Hoffman and his attorney, it would have constituted reversible error under *Dixon* and *Cox*. However, the jury note in this case indicated an apparent desire to hear the complete testimony of the three named witnesses, and Judge Hunt's response gave every indication that the court would honor the jury's request.

2. When a defendant is aware, prior to the verdict, of an improper *ex parte* communication and the defendant does not object, the defendant waives any error. *See Owens v. State*, 613 P.2d 259, 263 (Alaska 1980). It therefore appears that Hoffman waived any error as to the verdicts which the jury returned during the second phase of the trial which commenced after he learned of the *ex parte* communication. Since we find harmless error, we need not resolve the waiver issue.

must determine whether the evidence has relevance apart from the defendant's propensity to engage in similar misconduct.[3] Second, if the court determines that the evidence has some relevance apart from propensity, it must determine whether the nonpropensity relevance outweighs the prejudicial impact under A.R.E. 403. *Jordan v. State*, 895 P.2d 994, 999 (Alaska App.1995); *Lerchenstein v. State*, 697 P.2d 312, 315 (Alaska App.1985).

Hoffman was charged with engaging in a violent sexual assault upon K.V.; Hoffman defended by asserting that he had not assaulted K.V. (and that his sexual activity with her had been consensual). Thus, the jury was asked to decide whether K.V. had been coerced by force into engaging in sexual activity with Hoffman, and whether Hoffman had recklessly disregarded K.V.'s lack of consent. *See Reynolds v. State*, 664 P.2d 621 (Alaska App.1983).

We conclude that M.B.'s testimony was relevant to resolving these issues. Hoffman's violent (and apparently inexplicable) assault on M.B. occurred just prior to his encounter with K.V.; it therefore can be inferred that Hoffman was in the same emotional state during both encounters. We faced a similar evidentiary question in *Lerchenstein*, 697 P.2d at 317–19, where we held that Evidence Rule 404(b) allowed the introduction of evidence that a murder defendant had been "angry and combative ... immediately prior to the [homicide]." *Id.* at 319.

> [T]he primary issue ... was whether Lerchenstein was acting in self-defense when he shot [the victim]. In order to establish that Lerchenstein did not act in self-defense, the state was entitled to rely on evidence indicating that, at the time of the shooting, [Lerchenstein] was angry, emotionally agitated, and extremely combative—in other words, that he was not acting reasonably.... Since this evidence had specific relevance beyond its mere tendency to establish a propensity toward vio-

lence, its admission was not categorically precluded by Evidence Rule 404(b).

*Id.* at 317–18. We similarly conclude that, under the facts of this case, Hoffman's just-completed assault on M.B. had "specific relevance beyond its mere tendency to establish a propensity toward violence."

Because this evidence had a valid non-propensity purpose, Evidence Rule 404(b) did not categorically exclude it. Nevertheless, the trial judge still had to weigh the probative value of this evidence against its potential for unfair prejudice under Evidence Rule 403. In Hoffman's case, Judge Hunt gave extensive attention to this evidentiary question. In fact, she initially excluded the evidence in a pre-trial ruling. Later, she changed her mind and decided that the relevance of this evidence to establish Hoffman's state of mind outweighed its potential for unfair prejudice and justified its admission. Having examined the record, we conclude that Judge Hunt's ruling was not an abuse of discretion. *M.R.S.*, 897 P.2d at 66.

The judgment of the superior court is AFFIRMED.

---

**3.** A.R.E. 404(b)(1) provides:
  Evidence of other crimes, wrongs, or acts is not admissible if the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith. It is, however, admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.