NOTICE

*The text of this opinion can be corrected before the opinion is published in the* Pacific Reporter. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| JACE H. CUNNINGHAM, | Court of Appeals No. A-11731 |
| Appellant, | Trial Court No. 1PE-12-133 CR |
| v. | |
| | O P I N I O N |
| STATE OF ALASKA, | |
| Appellee. | No. 2578 — December 15, 2017 |

Appeal from the Superior Court, First Judicial District, Petersburg, William B. Carey, Judge.

Appearances: Susan Orlansky, Reeves Amodio LLC, Anchorage, for the Appellant. Donald Soderstrom, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge. [*]

Judge ALLARD.

Jace H. Cunningham was convicted of two counts of third-degree assault, four counts of fourth-degree assault, and other misdemeanor offenses based on a series

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

of altercations with multiple police officers who had responded to reports that Cunningham was suicidal and in possession of a firearm. On appeal, Cunningham challenges his two third-degree assault convictions,[1] arguing that the judge committed reversible error when he communicated with the jury about their deliberations outside the presence of defense counsel.

For the reasons explained here, we conclude that the trial court's communications with the jury constituted ex parte communications with the jury in violation of Cunningham's constitutional rights. We also conclude that the court's error was harmless beyond a reasonable doubt as to one of the third-degree assault convictions (Count VI) but that reversal is required on the other third-degree assault conviction (Count V).

*Background facts and prior proceedings*

On October 4, 2012, Jace Cunningham contacted his friends to say good-bye and to tell them that he planned to kill himself. Cunningham then drove several miles down Frederick Point Road outside of Petersburg with beer and a loaded rifle. Cunningham's friends went to talk to Cunningham, but were unable to dissuade him from his suicide plan. After leaving Cunningham at his request, the friends called the Petersburg Police Department to report Cunningham's suicide plan and his approximate location. The police department also received two other calls about Cunningham that evening — one from a Petersburg resident who heard a gunshot near Cunningham's parked car along Frederick Point Road, and one from Cunningham himself, asking for help.

---

[1]    Cunningham does not challenge any of his misdemeanor convictions.

In response to these calls, five Petersburg police officers and two mental health workers set out to make contact with Cunningham. The officers created a roadblock several hundred yards from where they believed Cunningham was located. The mental health workers and three of the police officers positioned themselves around and behind the roadblock, while the other two police officers positioned themselves on the side of the road in front of the roadblock. By the time the roadblock was set, it was dark.

In the meantime, Cunningham had decided to abandon his suicide plan and return to Petersburg. Cunningham began driving back along Frederick Point Road, unaware of the officers and the roadblock. After rounding a curve, Cunningham saw the roadblock, and he had to brake suddenly and swerve to avoid hitting a police vehicle. Cunningham's car landed in the roadside ditch near the police roadblock. Cunningham was able to reverse the car out of the ditch, but in his attempt to turn around, he drove the car into the ditch on the opposite side of the road.

The officers later reported that, while Cunningham's car was in the first ditch or while he was backing up, Cunningham fired two shots from his rifle. Officer Pitta-Rosse, the officer in the trees closest to the ditch, reported seeing what he believed was a muzzle flash. Four other officers reported hearing noises that they believed were gun shots. Because of the darkness, the officers did not know where the rifle was pointed when it was fired. Cunningham later testified at trial that he could not see any of the officers and did not know how many were there. Cunningham also denied firing his gun.

At some point after his truck got stuck in the second ditch, Cunningham got out of his vehicle and walked toward the roadblock holding his rifle. Sergeant Heidi Agner called out to Cunningham and tried to persuade him to put his gun down and submit to being taken into custody. Cunningham refused to put his gun down. During

the resulting standoff, Cunningham twice approached Sergeant Agner with his rifle pointed in her direction. Cunningham also made various threatening statements, including telling Sergeant Agner that he had her "in his scope" and that he could "kill all [of the officers]" before they could hurt him. After about an hour, Cunningham put his rifle down and allowed himself to be taken into custody.

Cunningham was indicted on six counts of third-degree assault for recklessly placing the officers in fear of imminent serious physical injury by means of a dangerous instrument (the firearm).[2] Counts I-V were based on the five officers who were put in fear by the two shots fired from Cunningham's car; Officer Pitta-Rosse was the victim identified in Count V. Count VI was based on Cunningham pointing his rifle at Sergeant Agner during the stand-off. In addition to the six third-degree assault counts, Cunningham was also charged with five misdemeanors, including misconduct involving a weapon, driving while intoxicated, refusing a breath test, and criminal mischief.

Cunningham was tried before a jury in Petersburg. The judge, the prosecutor, and the defense attorney were not from Petersburg and all three had to fly into Petersburg for the trial.

At trial, Cunningham requested and was granted conditional co-counsel status for the limited purpose of asking his own questions of witnesses after his attorney completed his cross-examination. The court explained to the jury that it was "granting a very limited request on Mr. Cunningham's part to be able to ask some questions himself of the witnesses." Cunningham availed himself of this privilege only once. The court also allowed Cunningham to give his own closing statement after his defense counsel gave the primary argument.

---

[2] AS 11.41.220(a)(1).

Cunningham testified in his own defense at trial. Cunningham's defense was mostly focused on the third-degree assault charges. Cunningham testified that he was upset and scared that night and that he never intended to harm anyone but himself. Cunningham also testified that he did not know how many officers were at the scene or where they were located. Cunningham denied firing any shots at the scene.

*Jury deliberations*

Cunningham's trial ended on a Friday and the jury began deliberations that same day. The jury was very active during their deliberations, making numerous requests for playbacks and sending notes asking for clarification of various legal issues.

On the afternoon of the second day of deliberations (Saturday), the jury sent a written note asking what would happen if it reached a unanimous verdict on some counts, but not on others. The trial judge notified the parties and convened a hearing to discuss the note. Cunningham and the defense attorney were both present. The trial prosecutor was not present because he was en route back to Juneau, but an attorney from his office participated telephonically.

The jury was brought into the courtroom and asked about the status of its deliberations. The foreperson indicated that they had reached verdicts on "about half the counts, and we're hung up on one count significantly." The trial judge encouraged the jurors to keep working and to reach verdicts on all counts, but the judge told the jurors that "it doesn't go on forever," and that they should let the judge know if they ultimately could not reach a unanimous verdict on any particular count, and they would then "come in and talk about it." The defense attorney and the prosecutor were in agreement with this approach, and the jurors were excused to continue their deliberations.

After the jury resumed its deliberations, the defense attorney left to fly home to Ketchikan. The judge asked the defense attorney to call in when his plane

landed in Ketchikan.[3]  The defense attorney agreed to do so.  The defense attorney was scheduled to land in Ketchikan sometime after 5:00 p.m.

At some point before the defense attorney's plane reached Ketchikan, the jury informed the bailiff that it had reached verdicts on all but one count.  (This communication was apparently made orally and was not properly memorialized in the record.)

Rather than waiting for the defense attorney's plane to land, the trial judge convened a hearing without the defense attorney present to discuss how to respond to the jury's announcement that it had reached final verdicts on all counts but one and that it was hung on that count.  This hearing was held at 4:48 p.m. — approximately twenty minutes before the defense attorney's plane was scheduled to land.

The judge and Cunningham were present in the Petersburg courtroom for the hearing.  The prosecutor participated in the hearing telephonically from Juneau.

At the hearing, the judge acknowledged the defense attorney's absence and stated that he was proceeding without the defense attorney because Cunningham had "co-counsel status" and "this is kind of an administrative type of hearing, really."  The judge then informed Cunningham and the prosecutor that his plan was to follow Alaska Criminal Rule 31(f), which would allow the jury's verdicts to be sealed and the jury to return the next day to formally announce the verdicts once the defense attorney was available.

The judge noted that he might "perhaps briefly discuss" the jury's status on the count on which it was hung.  He also noted that "there's a slight possibility that I

---

[3]   The judge also asked the defense attorney to call in when the plane stopped in Wrangell on the way to Ketchikan.  The parties appear to agree that this call happened but that the call came before the jury had announced that it had reached final verdicts on all counts but one count, on which they were hung.

might send [the jury] back to do some more deliberations, but I'm getting the feeling that's not going to be the case, given that the jury has had this case for well over 24 hours now and have not been able to reach a verdict."

The prosecutor noted that the next day was Sunday and that some of the jurors might want to go to church. He therefore suggested that the jurors be brought back Monday. The judge indicated that his preference was for the jury to return on Sunday because the judge planned to fly home to Ketchikan on Sunday afternoon. Nothing more was said about how the count on which the jury was hung should be handled.

At the end of the discussion, the judge asked Cunningham if he was "good" with proceeding without his defense attorney "for this limited purpose." The judge explained to Cunningham that the verdicts would not be announced until the defense attorney was available. Cunningham agreed that the judge could proceed without his attorney "[j]ust for this limited purpose."

The jury was then brought into the courtroom. The judge's initial action was to ask the foreperson if the jury was "hopelessly deadlocked" on the remaining count. The foreperson responded "I'm thinking that we're pretty deadlocked." The judge then advised the jury that he could not take the verdicts on the other counts without the defense attorney being present, but that he could seal the verdicts the jury had reached, place them in an envelope, discharge the jurors for the day, and then have them return briefly on the next day when the defense attorney could participate.

After informing the jury of this procedure (which was consistent with what he told the prosecutor and Cunningham he was going to do), the judge then mentioned some additional options for the jury. The judge told the jury that it could continue to deliberate that night to try to resolve the case, rather than have to come back the next day. The judge noted that the next day was Sunday, and that people might have church

or other responsibilities. The judge indicated that his own preference was for the jury to come back on Sunday, but that if "any of you can't make it tomorrow for some reason, we can talk about it [a]nd then make a determination whether further deliberations would be fruitful." The judge again noted that the jury had the option of continuing to deliberate longer that night, stating:

> Or, you know, the other thing is that we could keep going tonight, wait for [Cunningham's] attorney ... So does anyone have a problem with coming back briefly tomorrow, or would you prefer to keep deliberating and wait until later tonight to do it?

The jurors retired at 5:00 p.m. to discuss their options. At 5:05 p.m., the jury sent a note asking if the verdicts on Counts I-V "all need to be consistent." (Counts I-V were the third-degree assault charges that involved the five officers who had been placed in fear by the two gunshots from Cunningham's vehicle.)

At 5:10 p.m., the trial judge (apparently on his own initiative) sent a written note to the jury that instructed the jury "to reach verdicts on those counts that they are able to do so." It is not clear from the record why this communication was sent. The judge's note was written in a response to a question the jury had asked earlier that morning about what would happen if they were not unanimous as to all counts. But this question had already been answered orally by the judge (with input from both counsel) at an earlier hearing in which both attorneys were present. There is nothing in the record to suggest that the judge notified the parties that he was supplementing the earlier oral advisement with a written response. Nor is there any indication that the judge ever made the parties aware that this additional communication was sent.

At 5:13 p.m., the judge reconvened court to address the 5:05 p.m. jury note asking whether the verdicts on Counts I-V needed to be consistent. By this time, the defense attorney's plane had landed at the Ketchikan airport and the defense attorney

was able to participate in the hearing telephonically. There is nothing in the record to suggest that the defense attorney was ever told about the earlier hearing that occurred in his absence, or about the substance of the judge's communications with the jury at that hearing. There is likewise nothing in the record to suggest that the defense attorney was notified of the judge's recent *sua sponte* written communication with the jury.

At the 5:13 p.m. hearing, the defense attorney and the prosecutor both agreed that the court should direct the jury's attention to Instruction No. 39, which stated: "[a] separate offense is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." The judge then sent a written communication to the jury to that effect.

Shortly after receiving the judge's response, the jury advised the court that it had reached verdicts on all counts.

At 5:40 p.m., court was reconvened and the jurors delivered their verdicts. The jury found Cunningham guilty of two counts of third-degree assault — Count V (the count related to Officer Pitta-Rosse) and Count VI (the count related to Sergeant Agner). The jury acquitted Cunningham of the other four counts of third-degree assault, but convicted him of the lesser-included charge of fourth-degree assault in each instance. The jury also convicted Cunningham of the five charged misdemeanors.

This appeal followed.

*Cunningham's arguments on appeal*

On appeal, Cunningham argues that the court committed reversible error when it held a hearing without the defense attorney present in response to the jury's announcement that it had reached verdicts on all but one count. Cunningham acknowledges that this ex parte communication with the jury might potentially require reversal of all of his convictions, but he makes clear that he is only seeking reversal of

the two third-degree assault convictions (Counts V & VI). Cunningham further argues that the court committed reversible error by (1) sending a written response to the jury at 5:10 p.m. without notifying the parties that this response had been sent; (2) failing to notify the parties of the jury's playback requests without securing a waiver of the parties' right to be present on the record; and (3) permitting the jury to communicate informally with the court through the bailiff.

The State implicitly acknowledges that there were irregularities in the trial judge's communications with the jury, but the State argues that none of these irregularities require reversal of Cunningham's third-degree assault convictions. The State also argues that Cunningham personally waived his attorney's presence for the 4:48 p.m. hearing and that, in any case, the communication with the jury that occurred outside the defense attorney's presence was harmless beyond a reasonable doubt, at least with regard to Count VI.

*Did Cunningham knowingly waive his right to counsel at the 4:48 p.m. hearing?*

A criminal defendant has both a federal and state constitutional right to be present at every stage of his or her trial.[4] The right to be present includes the right to have counsel present.[5] A defendant is entitled to have the "guiding hand of counsel at every step in the proceedings against him"[6] and "[d]ue process requires that the court

---

[4]    *See Wamser v. State*, 652 P.2d 98, 101 (Alaska 1982); *Jones v. State*, 719 P.2d 265, 266 (Alaska App. 1986); *see also* Alaska Const. art. I, §§ 1, 7; Alaska R. Crim. P. 38(a); U.S. Const. amends. VI, XIV, § 1; *Illinois v. Allen*, 397 U.S. 337, 338 (1970).

[5]    *See Alexander v. City of Anchorage*, 490 P.2d 910, 913 (Alaska 1971) (quoting *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932)).

[6]    *Powell v. Alabama*, 287 U.S. 45, 69 (1932).

allow the defendant, with the assistance of counsel, input into the information and instructions given by the trial judge to the jury during its deliberations."[7]

The State argues that these constitutional principles were not violated in Cunningham's case because Cunningham knowingly waived his right to have his defense counsel participate in the 4:48 p.m. hearing. We disagree.

In order to validly waive his or her right to counsel, a defendant must "understand[] the benefits of counsel and knowingly waive[] the same."[8] Here, the record shows that Cunningham was not given enough information to knowingly and intelligently waive his right to have his attorney present when the judge communicated with the jury about its inability to reach a unanimous verdict on one count. The judge inaccurately referred to the 4:48 p.m. hearing as "an administrative type of hearing" and the judge only asked Cunningham to waive his right to counsel for "this limited purpose." But the ensuing communications with the jury were not merely administrative in nature. The judge directly questioned the jury about its status on the one remaining charge and the judge responded to the jury's announcement that it was "hopelessly deadlocked" on the one count by giving the jurors various options of how to proceed — options that included continuing to deliberate on that count despite their apparent deadlock.

Given these circumstances, we conclude that the record does not support the State's claim that Cunningham knowingly and intelligently waived his right to counsel at the 4:48 p.m. hearing. Accordingly, the judge's decision to proceed with that hearing, rather than to wait the twenty or so minutes until defense counsel would be

---

[7] *Newman v. State*, 655 P.2d 1302, 1307 (Alaska App. 1982); *see also Dixon v. State*, 605 P.2d 882, 887 (Alaska 1980).

[8] *McCracken v. State*, 518 P.2d 85, 91-92 (Alaska 1974).

available, was constitutional error that requires reversal of the challenged convictions unless the error is shown to have been harmless beyond a reasonable doubt.[9]

The fact that Cunningham had been granted conditional co-counsel status earlier in the case does not change this analysis. Cunningham's co-counsel status was limited to cross-examining the State's witnesses and delivering his own closing argument after his defense counsel had delivered the main closing argument. Cunningham never sought, nor was he ever granted, the right to represent himself, and the record is clear that his attorney remained the lead counsel.[10] Because Cunningham did not give up his right to be represented by counsel, his limited co-counsel status did not affect his constitutional right to have his attorney present at the hearing where substantive matters about the jury's deadlock on one count were discussed.

The State also argues that Cunningham's counsel "invited" the court's error by choosing to fly from Petersburg back home to Ketchikan during jury deliberations. According to the State, Cunningham's attorney put the court in a difficult position, in that error would likely ensue whatever option the court chose — whether waiting for defense counsel to become available or proceeding, as the court did, without defense counsel present.

We find no merit to this contention. Here, defense counsel's decision to be out of contact for less than an hour, with the court's tacit approval, cannot be seen as an invitation to the court to hold proceedings without the attorney. In *Blair v. State*, we held

---

[9]    *Wamser*, 652 P.2d at 103.

[10]    *See Alaska Pub. Def. Agency v. Superior Court, Third Judicial Dist., Anchorage*, 343 P.3d 914, 915 (Alaska App. 2015) (explaining difference between co-counsel status where the defendant remains represented by counsel and situations where defendant has fully waived his right of representation and is representing himself, either with or without the assistance of stand-by counsel).

that it was reversible error for the court to conduct a playback without defense counsel in a forty-five minute period of time during which defense counsel had previously notified the court that he would be unavailable.[11]  We declined to find invited error in *Blair*, and we similarly find none here.

*Was the ex parte communication with the jury outside the presence of the defense attorney harmless beyond a reasonable doubt?*

When a trial court engages in ex parte communications with a jury during jury deliberations, the State bears the burden of showing that the ex parte communication was harmless beyond a reasonable doubt.[12]  Whether error is harmless beyond a reasonable doubt in this context requires a determination of whether there is a reasonable possibility that defense counsel's presence could have had an impact on the jury's deliberative process.[13]  As prior case law explains, the focus of the inquiry is on whether the defense counsel might have influenced the nature and content of the court's communication with the jury, rather than on whether the content of the communication that was made without the defense attorney's participation was itself improper.[14]

We have previously found harmless error in circumstances where the judge's ex parte communications to the jury contained no substantive information — that is, where the judge's communication could not have had any possible effect on the jury's

---

[11]  *Blair v. State*, 42 P.3d 1152, 1153-54 (Alaska App. 2002).

[12]  *See Wamser*, 652 P.2d at 103; *Dixon*, 605 P.2d at 884; *State v. Hannagan*, 559 P.2d 1059, 1065 (Alaska 1977); *Chapman v. California*, 386 U.S. 18, 23-24 (1967).

[13]  *Wamser*, 652 P.2d at 103; *Dixon*, 605 P.2d at 884.

[14]  *See Jones*, 719 P.2d at 267; *see also Raphael v. State*, 994 P.2d 1004, 1013 (Alaska 2000).

deliberations.[15] The State argues that this was the situation here, particularly with regard to Count VI — the third-degree assault conviction based on Cunningham pointing his rifle at Sergeant Agner.

We agree with the State that the ex parte communication with the jury at the 4:48 p.m. hearing was harmless beyond a reasonable doubt with regard to the jury's guilty verdict on this count. The State's evidence on this count was particularly strong. More importantly, the record clearly indicates that the jury reached its guilty verdict on Count VI during the first day of its deliberations. When the trial court took the jury's verdicts on the second day of deliberations, the court noted that some of the verdicts (including the guilty verdict on Count VI) had been signed the day before.[16] The foreperson confirmed that the jury had reached those verdicts the previous day.

The other jury communications in the case further confirm that the jury's struggles were not over Count VI. As already explained, the jury informed the court on the second day of deliberations that it had reached verdicts on some of the counts but that it was struggling with one count in particular. Later that day, the jury announced that it had reached a final verdict on all counts but the one on which it was hung. After the jury was returned to the courtroom to discuss the options presented at the 4:48 p.m. hearing, the jury sent another note asking if its verdicts on Counts I-V (the third-degree assault

---

[15] *See, e.g.*, *Crouse v. Anchorage*, 79 P.3d 660, 664-65 (Alaska App. 2003) (harmless error when defendant was not notified of jury's note requesting an additional verdict form); *see also Hoffman v. State*, 950 P.2d 141, 145-46 (Alaska 1997) (harmless error when judge responded to a playback request with logistical considerations and defendant had previously waived presence for playbacks).

[16] The verdict forms for Counts VI (third-degree assault against Sergeant Agner), VIII (refusal to submit to a chemical test), X (fifth-degree criminal mischief), and XI (fifth-degree criminal mischief) were signed on the first day.

charges involving the other officers and the gunshots from the vehicle) had to be consistent, indicating that the hung count was one of those charges.

Given this record, we agree that the State has met its burden of showing that there is no reasonable possibility that the ex parte communications that occurred at the 4:48 p.m. hearing and in the 5:10 p.m. written note could have affected the jury's deliberations on Count VI, a count on which it was clearly no longer actively deliberating.

We reach the opposite conclusion, however, with regard to the jury's guilty verdict on Count V. As already noted, the jury's 5:05 p.m. note indicates that the jury was hung on one of the first five counts (Counts I-V). The jury broke through its deadlock on the last remaining count only after the 4:48 p.m. ex parte hearing and only after the jury was instructed that its verdicts on Counts I-V did not need to be consistent. When the verdicts were finally announced, the jury's verdict on Count V (the count involving Officer Pitta-Rosse) was not consistent with the verdicts on Counts I-IV.

The record is also clear that the jury had been struggling with this same count for some time and that the court was already prepared for the fact that it might not be able to reach a verdict on that count. Indeed, the court specifically noted to the prosecutor at the 4:48 p.m. hearing that it was "getting the feeling" that further deliberation would not be helpful — a feeling that was seemingly confirmed by the foreperson's later announcement that the jury was "hopelessly deadlocked" on that final count.

Given this record, we conclude that there is a reasonable possibility that the defense attorney's participation in the 4:48 p.m. hearing might have had an impact on the nature of the court's communication with the jury and the outcome of the jury's deliberative process. Among other things, the defense attorney could have convinced the court to accept at face value the jury's declaration that it was now "hopelessly

deadlocked," and to declare a mistrial on that count and allow the other ten verdicts to be taken.

Instead, because the 4:48 p.m. hearing was held without the defense attorney's input, the judge responded to the jury's announcement that it was "hopelessly deadlocked" by directly encouraging the jurors to continue to deliberate on that count despite their apparent deadlock, and by telling the jury that if they could not reach a verdict that day, the judge preferred to make them return on Sunday — because that fit his schedule better. The judge's response may have put pressure on the jurors to compromise their individual viewpoints and to agree to a verdict on that last count, rather than face the burden of having to return to court on a Sunday.[17] This pressure may have also been further compounded by the judge's subsequent ex parte written communication with the jury, which *sua sponte* instructed the jury (without notice to the parties) that the jury should try "to reach verdicts on those counts that they are able to so."

Thus, because there is a reasonable possibility that the defense attorney may have been able to influence the outcome of the 4:48 p.m. hearing and the jury's deliberations on Count V, we conclude that the court's decision not to wait the twenty minutes that it would have taken to secure the defense attorney's presence was constitutional error that was not harmless beyond a reasonable doubt as to that count. Reversal of that conviction is therefore required.

We take this opportunity to remind trial judges of the risks of any ex parte communications with the jury. We also remind judges that communications from the

---

[17] *See Fields v. State*, 487 P.2d 831, 838-43 (Alaska 1971) (prohibiting courts from instructing juries that have declared themselves to be hung with coercive language that might "place the holders of a minority viewpoint in a vulnerable position" or that might pressure the jurors to reach a conclusion on something other than the "evidence and argument in open court") (internal citations omitted).

jury should, in most instances, be handled formally and should be properly memorialized in the record. Lastly, trial judges should be mindful that the parties should be notified of any requests for playbacks unless they waive their right to notice, and that any waiver of that right should take place on the record.[18]

*Conclusion*

Cunningham's conviction on Count V is REVERSED. The judgment of the superior court is otherwise AFFIRMED.

---

[18] *Dixon*, 605 P.2d at 884-89; *Hoffman*, 950 P.2d at 145-46.